**UNITED STATES of America,**

v.

**Anthony GUARIGLIA, Defendant.**

**No. 90 Cr. 414 (MBM).**

United States District Court,
S.D. New York.

Feb. 11, 1991.

**260**

Steven A. Standiford, Asst. U.S. Atty., New York City, for U.S.

Roland Thau, The Legal Aid Soc., Federal Defender Services, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Anthony Guariglia has been indicted on five counts, one charging contempt of a Bankruptcy Court order that he not gamble, and four charging false statements. Of the latter, two involve alleged perjured testimony at the trial of *United States v. Wallach, et al.,* S87 Cr. 985 (RO) on the subject of whether Guariglia had gambled, and the remaining two involve alleged false statements to prosecutors, one also dealing with whether Guariglia had gambled and

the second dealing with whether he had told a prospective investor in a business he owned with his wife, and that investor's accountants, that actual receipts exceeded those recorded on the books and that he had skimmed off the difference.

Guariglia has moved on various grounds to dismiss each of these counts. For the reasons set forth below, the motion is denied in its entirety. The facts set forth below were established in submissions by the parties and at a hearing on January 28 and 29, 1991.

## I.

Guariglia was an officer of Wedtech Corporation who agreed in January 1987 to plead guilty to two federally charged counts of conspiracy and two state counts of grand larceny, and to cooperate with prosecutors in their investigation of multiple crimes committed by him and other Wedtech executives, and by the public officials who accepted bribes in return for using their influence to help the company win government contracts. The criminality that pervaded Wedtech was the subject of at least three trials in this District, *United States v. Biaggi*, 87 Cr. 265 (CBM); *United States v. Stolfi*, 88 Cr. 53 (MBM); *United States v. Wallach, supra*, and has already been set forth in numerous opinions of this Court and the Court of Appeals, *see, e.g., United States v. Biaggi*, 909 F.2d 662 (2d Cir.1990); *United States v. Stolfi*, 889 F.2d 378 (2d Cir.1989), and need not be described here. It is sufficient to note that Guariglia testified as a government witness at all three trials and has cooperated with government counsel both here and in other jurisdictions, in both criminal and civil cases. Guariglia's cooperation agreement with the government obligated him to refrain from committing "any further crimes whatsoever." (GX 1, p. 4)

Wedtech was adjudicated a bankrupt in the Bankruptcy Court for this District. In aid of protecting assets for the benefit of Wedtech's creditors, a June 30, 1988 order of that Court restrained Guariglia from gambling with any of his assets.

Guariglia testified extensively in the *Wallach* trial in the spring and summer of 1989, and was examined and cross-examined at length on the crimes and other bad acts he had committed at Wedtech and after he left, including his gambling. As set forth in the indictment in this case, that testimony included the following:

"Q. Did there come a time when your gambling ceased?

A. Yes.

Q. When was that?

A. Last summer, the summer of 1988."

(Count Two)

"Q. Now, the fact of the matter is that you continued to gamble after the summer of 1988; right?

A. No."

(Count Three)

In December 1989 prosecutors received allegations that Guariglia had perjured himself in several respects. These allegations included a claim that, contrary to the quoted testimony, Guariglia had gambled at a casino in Puerto Rico in November 1988. They were also informed that Guariglia had told a prospective investor in A and H Toys & Hobbies, Inc., a corporation he owned with his wife, and that investor's accountants, that net sales exceeded reported sales and that Guariglia had been able to skim off the difference.

Guariglia as of January 1990 had not yet been sentenced in connection with his plea in this Court. After the prosecutors obtained what they considered to be sufficient corroboration for the gambling and skimming allegations, they decided to seek an arrest warrant for Guariglia based on what they considered to be a breach of his cooperation agreement and therefore a breach also of his bail conditions, but not actually to arrest Guariglia until they gave him an opportunity to rebut or explain the allegations. On January 10, 1990, Assistant U.S. Attorney Baruch Weiss appeared *ex parte* before Judge Charles E. Stewart of this Court, before whom Guariglia's case was then pending. He summarized the allegations against Guariglia and the warrant was authorized. (Tr. 16–18, 51)

Weiss and his colleagues had decided to invite Guariglia to the U.S. Attorney's Office on the pretext of seeking information about another prospective Wedtech defendant, and then to confront Guariglia with the allegations. (Tr. 17–18) Either on January 10 (Tr. 17) or the week before (Tr. 78), an IRS agent who had worked on the Wedtech cases called Guariglia to set the ruse in motion. Guariglia came to the prosecutor's office late on the morning of January 11 and was shown into Weiss' office. Present were Weiss, Assistant U.S. Attorney Eliot Jacobson, the IRS agent John Ryan, and an FBI agent, all persons known to Guariglia and with whom he had worked extensively for most or all of the approximately three years of his cooperation. (Tr. 19) Weiss summarized the allegations against Guariglia, told him that the arrest warrant had been obtained, showed Guariglia a copy of the warrant, and said the prosecutors would seek Guariglia's immediate remand unless he could give a satisfactory rebuttal or explanation of the charges. Guariglia claims Weiss told him he was under arrest (Tr. 81); Weiss asserts he said only that Guariglia would be arrested. (Tr. 21) The difference is academic, because the government has conceded that although Guariglia was not handcuffed at any point, neither was he free to leave and was *de facto* under arrest throughout his conversations with the prosecutors. (Tr. 130)

Either at Weiss' suggestion, if Weiss is to be credited (Tr. 19), or at Guariglia's, if Guariglia is to be credited (Tr. 82–83), Guariglia called his lawyer, Michael Rips, who arrived soon afterward. The prosecutors told Rips that there were new charges against his client which constituted in the prosecutors' view a breach of the terms of Guariglia's release, that an arrest warrant had been secured the day before, that Guariglia would be offered an opportunity to explain or rebut the charges, and that if he either remained silent or offered an unsatisfactory explanation, the prosecutors would seek his remand that afternoon before Judge Stewart. (Tr. 127–28) Although the prosecutors alluded in general terms to possible charges other than the gambling and A and H skimming, and told Guariglia

and Rips that the investigation was continuing, it is apparent that the focus was on those two charges. (Tr. 133–34) In addition to the threat of jail, Guariglia testified that he was also laboring on January 11, 1990 under the burden of his sister-in-law's mortal illness and other family pressures. (Tr. 89–90)

Rips and Guariglia met for about an hour (Tr. 25, 94), and then returned to Weiss' office where Guariglia presented his rebuttal to the charges. Although Guariglia testified that his statements during that rebuttal to the charges were elicited by prosecutors who questioned him (Tr. 103–04), Weiss and Rips both testified that Guariglia carried the burden of the conversation, and that he was interrupted infrequently if at all. (Tr. 27, 134–35) At no time did Rips object to the proceedings or ask that they be stopped (Tr. 137), nor were voices raised. (Tr. 141) At no time was Guariglia told that his statements would not be used against him, nor were his conversations that day with prosecutors part of any plea negotiation. (Tr. 139–40) As is apparent from the indictment in this case, Guariglia's explanation did not satisfy the prosecutors, who sought and obtained his remand that afternoon before Judge Stewart. He was released, albeit with restrictions, a day later.

## II.

### A. *Good Faith Defense to Contempt*

■ Guariglia has moved against the contempt count based on his alleged good faith belief that the goals of the order not to gamble already had been achieved, and has requested a hearing on that issue. Whether or not Guariglia's proffered defense is sufficient, *but see, e.g., United States v. Ray*, 683 F.2d 1116, 1126–27 (7th Cir.), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982), it is a defense, and therefore a matter to be established at trial rather than a matter to be made the subject of a hearing before trial. Accordingly, the request for a hearing and the motion to dismiss are both denied.

## B. *Severance of Count Five*

█ Defendant has moved also to sever Count Five of the indictment, which deals with alleged false statements to prosecutors relating to skimming at A and H Toys, on the ground that it bears no relationship to the subject matter of the other counts, which all relate to gambling, and therefore is not properly joined in the same indictment with those counts. He asserts that at trial he will suffer the spillover effect of the first four counts, and that he "might wish to testify concerning Count V" but not concerning the other four counts, and thereby suffer prejudice from the inclusion of Count V in the indictment. (Guariglia Mem. 12–13)

Rule 8(a), Fed.R.Crim.P., permits joinder of offenses as follows:

"Two or more offenses may be joined in the same indictment ... in a separate count for each offense if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Guariglia argues that although the conduct charged in Count V—false statements—is the same kind of conduct charged in three of the four preceding counts, it involves falsity on a different subject and therefore should not be considered "of the same or similar character" to the other counts under the Rule. (Guariglia Mem. 8) Further, he argues that the charged acts in the other counts and in Count V are not "connected together" because the other counts relate to Wedtech and Count V does not. (*Id.* at 7) Guariglia relies primarily if not exclusively on *United States v. Halper,* 590 F.2d 422 (2d Cir.1978), where the Court reversed the conviction of a defendant tried for Medicaid fraud, and for evading taxes payable for the period when the fraud was ongoing but otherwise having no demonstrable connection to the fraud. The similarity between the offenses urged by the government, that both involved dishonest manipulation of others in aid of profit, was insufficient to justify joinder. 590 F.2d at

431. Moreover, the Court noted that proof of one offense would not be admissible at the trial of the other. *Id.* at 432.

*Halper,* however, does not resolve the issue before me, wholly apart from the fact that that case involved indictments initially separate and thus arose under Fed.R. Crim.P. 13, to which somewhat different considerations apply. *United States v. Werner,* 620 F.2d 922, 927 (2d Cir.1980). In this case, Guariglia is accused of making false statements initially at the *Wallach* trial and later to prosecutors about his gambling. The falsity of those statements meant also that Guariglia was in contempt of the Bankruptcy Court order. At the same time he repeated to prosecutors his allegedly false testimony about gambling he also made allegedly false statements about what he had told potential investors in A and H Toys. The latter are the subject of Count V. The underlying conduct with respect to both categories of allegedly false statements calls into question Guariglia's compliance with the cooperation agreement between him and the government. Thus the conduct charged in the two groups of counts not only is of a similar character—false statements, notwithstanding their subject matter, but also is "connected together" in at least two respects: (i) all of the underlying conduct that is the subject of the allegedly false statements, if proved, would constitute a violation of the cooperation agreement, and (ii) the alleged false statements on both subjects were made to prosecutors at the same time and for the same reason to avoid going to jail. Indeed, the latter connection shows that the false statements as to gambling and as to A and H Toys may be said to have occurred as part of the "same ... transaction" within the Rule, and also that proof of one would be admissible at the trial of the other to show connection to a common scheme or intent. Fed.R.Evid. 404(b).

In *Werner,* 620 F.2d at 926, the Court upheld the conviction of a defendant charged with participating in airport thefts in 1976 and 1978 solely on the ground of the similarity of the offenses. In *United States v. Turoff,* 853 F.2d 1037, 1044 (2d Cir.1988), the Court sustained the convic-

tion of a defendant convicted of participating in two schemes, one of which was said to have arisen from the other. This case is *a fortiori* from *Werner* and *Turoff*, there being present here both a similarity and a connection between Count V and the remaining offenses.

### C. *Suppression of January 11 Statements*

■ Nothing in the events of January 11 warrants suppression of Guariglia's statements. Whether or not he was under arrest when he made the statements, he had a lawyer present, and that is all the law requires. Nor does it change the result to note that Guariglia was not given *Miranda* warnings. Guariglia had a lawyer present. As a matter of simple logic, if *Miranda* warnings are meant to protect a defendant until he can consult counsel, *Minnick v. Mississippi*, — U.S. —, 111 S.Ct. 486, 489, 112 L.Ed.2d 489 (1990), they are not necessary when counsel is present. Indeed, *Miranda* itself taught that what is protected by the mandatory warnings it prescribes is the presence of counsel: "The presence of counsel ... would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege." *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694 (1966). The Supreme Court has so interpreted *Miranda:* "The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 485–86, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Guariglia's lawyer was an accomplished practitioner. (Tr. 121–22) Moreover, false statements made in the course of an interview designed to convince the government not to prosecute are admissible. *United States v. Cunningham*, 723 F.2d 217, 227–28 (2d Cir.1983), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984).

The government's ruse, on which Guariglia places a good deal of rhetorical emphasis, is irrelevant. The government had a warrant and was entitled to arrest Guariglia. That prosecutors chose instead to allow him an opportunity to explain, and the way in which that opportunity was offered, do not lead to the conclusion that Guariglia was free to try to lie his way out of his difficulty and to suppress his statements if he was not successful.

### D. *Motion to Dismiss Counts Two, Three and Four as Multiplicitous*

Although Guariglia attacks as multiplicitous all three counts that charge him with making false statements about his gambling, he raises two distinct issues as to the propriety of those counts. Neither, however, is sufficient to warrant dismissal of any of the counts at this stage of the case.

■ 1. The perjury charged in Count Two of the indictment is that while testifying in *United States v. Wallach*, Guariglia responded falsely to a question from a prosecutor on direct examination when he said his gambling had stopped in the summer of 1988. The perjury charged in Count Three is that he denied falsely, in response to a question from a defense lawyer a week later during cross-examination at the same trial, that his gambling had continued beyond the summer of 1988. In this setting, charges may be considered multiplicitous, and thereby in violation of the Double Jeopardy clause of the Fifth Amendment, if they arise from an attempt to "bludgeon a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts." *Gebhard v. United States*, 422 F.2d 281, 289–90 (9th Cir.1970). Here, the charges deal with questions addressed to the same issue, but posed by different lawyers a week apart. Arguably, they involve separate decisions by Guariglia to perjure himself. In any event, potential prejudice to Guariglia arising from the separate charges in Counts Two and Three can be prevented at the time of sentence, if that time arrives, by imposing concurrent sentences. *United States v. Reed*, 639 F.2d 896, 904 n. 6 (2d Cir.1981).

■ 2. Count Four charges that Guariglia made a false statement to prosecutors during his January 11, 1990 presentation when he again denied having gambled later

than the summer of 1988. This does not create multiplicity between Counts Two and Three on the one hand, and Count Four on the other. The three-step test for determining whether Congress intended to allow multiple punishments for conduct that violates two separate statutes is described in *United States v. Nakashian*, 820 F.2d 549 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987) as follows:

"1) If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision. 2) It must next be determined whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended to authorize multiple punishments is a reasonable one. The *Blockburger* test is employed in making this determination. Under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* at 304, 52 S.Ct. at 182. 3) If *Blockburger* is satisfied, the final step is to test the tentative conclusion that multiple punishments are authorized against the legislative history of the statute to discover whether a contrary Congressional intention is disclosed. If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that congress intended to authorize multiple punishments."

820 F.2d at 551 (citations omitted). By that standard,[1] the counts in question are not multiplicitous. Perjury and false state-ments to government officials are punishable under separate statutes with separate elements. No evidence of a Congressional intention to bar multiple punishments has been adduced by defendant, and research has disclosed none.

### E. The Exculpatory "No" Defense

■ Guariglia has moved to dismiss the false statements charges in Counts Four and Five based on the "exculpatory no" doctrine, which holds that in circumstances otherwise appropriate, a simple denial of guilt may not be prosecuted as a false statement under 18 U.S.C. § 1001. *See, e.g., United States v. Alzate–Restreppo*, 890 F.2d 1061, 1065–66 (9th Cir.1989). The Second Circuit wrote of that doctrine in *United States v. Capo*, 791 F.2d 1054 (2d Cir.1986): "While this Court has never quite embraced the 'exculpatory no' exception, we have consistently stated that if we did adopt it we would construe it narrowly, ruling that any statement beyond a simple 'no' does not fall within the exception." 791 F.2d at 1069 (citations omitted). The government has made it clear that both of the challenged counts charge more than a simple "no." Accordingly, the doctrine, even if it were to be adopted in this Circuit within the limits described by the Court in *Capo*, would not control this case.

### F. Materiality of Alleged Perjury

■ Guariglia moves to dismiss the perjury counts on the ground that the testimony alleged to be false was not material as a matter of law, and asks secondarily that I submit the issue of materiality to the jury and require that it be proved beyond a reasonable doubt.

Taking the second argument first, Guariglia invites me to follow the scholarly opinion in *United States v. Taylor*, 693 F.Supp. 828 (N.D.Cal.1988), and to hold that materiality is an element to be proved to the jury beyond a reasonable doubt. Thus, Guariglia necessarily urges that I reject what he dismisses as the "mechanical" application

1. To the extent *Grady v. Corbin*, — U.S. —, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) supplements the *Blockburger* test as applied to subsequent prosecutions, that change has no relevance here, where we deal with charges in a single indictment.

of "ancient precedent" (Guariglia Reply Mem. 6) rooted in dictum in *Sinclair v. United States,* 279 U.S. 263, 298–99, 49 S.Ct. 268, 273–74, 73 L.Ed. 692 (1929), to the effect that materiality is to be decided by the court applying a preponderance of the evidence test. Guariglia thereby would have me sweep aside the Supreme Court's recent reiteration and endorsement of *Sinclair* in *Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988), not to mention such authority as *United States v. Weiss,* 752 F.2d 777, 786 (2d Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985), and cases cited therein, including *Cunningham, supra,* where the Court found that submitting the issue of materiality to the jury, to be proved beyond a reasonable doubt, after the trial court already had found the alleged perjury material, gave the defendant "a dual advantage (determination of materiality by the jury as well as by the judge and imposition of a higher standard of proof) to which he was not entitled." 723 F.2d at 226.

The District Court in *Taylor* reviewed then-existing authority, including *Kungys,* and concluded in essence that permitting the trial court to determine materiality, and to do so by a preponderance of the evidence, denied due process in that it denied to a defendant the right to require that the government prove every element of a crime beyond a reasonable doubt to the satisfaction of a jury before a judgment of guilt may be entered, as guaranteed in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and its progeny, including *Cabana v. Bullock,* 474 U.S. 376, 384–85, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986). The *Taylor* court determined that no other court previously had addressed the perceived conflict between *Winship* and its progeny on the one hand, and the *Sinclair/Kungys* dictum on the other, 693 F.Supp. at 831, and accordingly that it was free to agree with the defendant in that case that "the emperor wears no clothes, [and] ... that materiality must be proven beyond a reasonable doubt to the jury just like any of the other elements of any serious crime." 693 F.Supp. at 830. Guariglia

notes also that the reigning jury instruction treatise in these parts, Sand, *Modern Federal Jury Instructions,* cites the *Winship* line of cases as undermining the vitality of *Sinclair* and concludes that, "The better practice is to give the question of materiality to the jury." *Id.* at ¶ 48.02, pp. 48–13–48–14.

With due respect to the *Taylor* court, not to mention the treatise and its authors, I do not feel free to follow Guariglia's suggestion. I am bound by the considered and reiterated pronouncements of this Circuit and the Supreme Court, whether or not one characterizes them as "dictum." *United States v. Oshatz,* 912 F.2d 534, 540 (2d Cir.1990).

However, even if I did adopt a more free-wheeling view of my authority, it is not at all clear that *Taylor* and the treatise have reason and fairness on their side. First, the current perjury statute under which Guariglia was indicted was enacted and reenacted after *Sinclair.* Pub.L. 91–452, Title IV, § 401(a) (1970); Pub.L. 94–550, § 6 (1976). Congress normally can be presumed to be aware of relevant interpretations insofar as they affect a new or reenacted statute. *Lorillard Div. of Loew's Theatres, Inc. v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) and cases cited therein. Accordingly, it is questionable whether materiality is an "element" of perjury as that term is used in *Winship* and its progeny.

Moreover, materiality is the flimsiest of obstacles to a perjury conviction. "Materiality is ... demonstrated if the question posed is such that a truthful answer could help the inquiry, or a false response hinder it, and these effects are weighed in terms of potentiality rather than probability." *United States v. Berardi,* 629 F.2d 723, 729 (2d Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). This definition is indistinguishable from the threshold concept of relevance articulated in the Federal Rules of Evidence, which define relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less proba-

ble than it would be without the evidence." Fed.R.Evid. 401. Such threshold determinations traditionally are made by the court.

Further, to the extent that materiality is an obstacle to conviction, that obstacle must be overcome by the jury when it considers the issue of intent. A defendant can argue to the extent the facts permit that he could not have intended to perjure himself because the alleged lie was of no consequence, although that is less true of a defendant like the one in this case whose alleged perjury was of greater consequence to him—because to have admitted the truth would have shown that he violated a court order—than it was to the jury in the *Wallach* case, which had a great deal of impeaching information that it could use to measure Guariglia's credibility.

Finally, because materiality weighs merely tendency and not even probability, it introduces a concept that is itself at odds with the standard of proof beyond a reasonable doubt. Thus, the jury would be told on the one hand that the government must prove its case beyond a reasonable doubt, but that what must be proved beyond a reasonable doubt in the case of materiality is a mere tendency. That could cause substantial confusion to a defendant's prejudice. That is not to say that jurors are never called upon in criminal cases to apply two different tests of burden of proof. There are issues on which the government has the burden of proof by a preponderance of the evidence, *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984) (venue), and issues on which the defendant has the burden of proof. *United States v. Braver*, 450 F.2d 799, 804 n. 12 (2d Cir.1971), *cert. denied*, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972) (defense of coercion). But that is far different from saying that it is desirable to multiply such issues, or that it is "the better practice" to do so, particularly when the test of materiality is so attenuated.

Submitting such an issue to the jury could also occasion a trial within a trial, with the jury diverted by the need to examine the entire scope of the proceeding in which the alleged perjury took place in order to evaluate "materiality."

Thus, I am constrained to find that the proverbial emperor is fully and splendidly clothed, and that it is not "the better practice" to submit materiality to the jury.

Turning to the first issue raised by Guariglia, I find that a truthful answer to the questions could have tended to undermine Guariglia's credibility, and thus could have helped the inquiry on which the jury was embarked in the *Wallach* case. Therefore, his motion to dismiss Counts Two and Three for lack of materiality must be denied.

For the reasons set forth above, Guariglia's motions are denied.

SO ORDERED.