# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1564MN

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the District of |
| | * | Minnesota. |
| George Gerald Chamberlain, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 20, 1998

Filed: December 24, 1998

_____

Before BOWMAN, Chief Judge, BRIGHT and RICHARD S. ARNOLD, Circuit
Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


A jury convicted George Gerald Chamberlain of conspiracy to distribute child
pornography, in violation of 18 U.S.C. § 371, and possession of child pornography, in
violation of 18 U.S.C. § 2252(a)(4)(B). Chamberlain was sentenced to seven years and
three months (87 months) in prison, to be followed by a three-year term of supervised
release, to commence at the conclusion of a sentence Chamberlain is currently serving
for a separate crime. Chamberlain appeals his conviction and sentence on a number
of

grounds, including the admission of statements he made to state prison officials who failed to precede their questioning with a <u>Miranda</u> warning. We believe that Chamberlain's statements were made while he was in custody for <u>Miranda</u> purposes. We therefore reverse on the <u>Miranda</u> issue and remand for a new trial.

I.

While serving a prison sentence for criminal sexual conduct, Chamberlain worked at Insight, a nonprofit corporation operating in the Minnesota state prison facilities. Inmates in the Insight program did telemarketing and computer programming work on contracts Insight made with various companies. The money Insight earned on the contracts was used to fund college programs for the inmates in the program. (Trial Tr. 49-50.) Chamberlain had his own office within the Insight offices in the prison, as well as his own computer. (Trial Tr. 41.) In November 1994, a news report alleging financial misconduct within the Insight program resulted in an administrative investigation of the program. During a search of the Insight offices, Department of Corrections investigators found lists of children's names and addresses, and an optical disk which they suspected contained child pornography, in Chamberlain's office. (Trial Tr. 45-46.)

As part of the investigation, investigators interviewed all of the prison inmates taking part in the program, including Chamberlain. (Trial Tr. 43.) The statements Chamberlain sought to suppress on <u>Miranda</u> grounds were made during two interviews in which Chamberlain was questioned by investigators. The <u>Miranda</u> issue turns on the circumstances of these interviews – on whether Chamberlain was "in custody" as defined by <u>Miranda</u> and its progeny. We therefore state in some detail the facts related to the interviews, culled from both the pretrial motion hearing and the trial itself.

The interviews took place in the Insight offices, inside the prison. Special investigator Mark Freer conducted Chamberlain's first interview. Because the Insight

offices were secured during the investigation, any inmate brought in for an interview had to be escorted to the offices. (Pretrial Mot. Hr'g Tr. 111.) During the pretrial motion hearing Freer testified that although he did not recall how Chamberlain arrived for his interview, Freer generally either brought the inmates down to the offices himself or had another officer bring them down. Freer would then usually meet the officer halfway. (Pretrial Mot. Hr'g Tr. 95.) The interview took place in an office located near Chamberlain's own office. The door to the room was closed but unlocked. Chamberlain was not restrained in any way, and Freer displayed no weapons. (Pretrial Mot. Hr'g Tr. 95-97.) At no time during this interview, or the interview which followed later, did any investigator give Chamberlain a Miranda warning.

Towards the end of the interview, Freer asked Chamberlain about the child lists found in Chamberlain's office. Chamberlain denied any knowledge of the lists. (Trial Tr. 138.) Later the same day, however, in a second interview conducted by Steven Ayers, another special investigator employed by the Department of Corrections, Chamberlain admitted that he lied to Freer in the earlier interview and admitted knowledge of the lists. (Trial Tr. 155.) After the interview, Ayers told Chamberlain that he was going to be placed in administrative segregation and transferred to the Stillwater Correctional Facility. The Stillwater facility is a higher-level security facility than the Lino Lakes facility, where Chamberlain was then imprisoned. (Trial Tr. 21.) Chamberlain then indicated that he wanted to contact an attorney and was no longer willing to conduct further interviews. (Pretrial Mot. Hr'g Tr. 125.)

Chamberlain filed a pretrial motion to suppress the statements he made regarding the child lists. A magistrate judge, believing that Chamberlain was not "in custody" for Miranda purposes, recommended denying the motion, and the District Court adopted the recommendation. Tapes of Chamberlain's interviews were played for the jury at Chamberlain's trial, including portions of the interviews related to the child lists. (Trial Tr. 135, 159.) Additionally, the government discussed the lists in its closing argument. (Trial Tr. 894-95.) Chamberlain argues on appeal that the statements should not have

been admitted into evidence because the statements were made during a custodial interrogation not preceded by a Miranda warning.

## II.

We review the District Court's findings concerning custody under a clearly erroneous standard. See United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). And we will affirm that decision "unless the decision . . . is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or in light of the entire record we are left with a firm and definite conviction that a mistake has been made." Id. at 1348 (quoting United States v. Jorgensen, 871 F.2d 725, 728 (8th Cir. 1989)). We believe, in this case, that a mistake has been made.

A Miranda warning must precede any custodial interrogation. A custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). An individual already in prison on another matter at the time of questioning is not necessarily, however, "in custody" for Miranda purposes. The mere fact of incarceration does not ipso facto render an interrogation custodial. Leviston v. Black, 843 F.2d 302, 304 (8th Cir. 1988) (citing Flittie v. Solem, 775 F.2d 933, 944 (8th Cir. 1985) (en banc)). A number of other circuits have a similar rule. See United States v. Menzer, 29 F.3d 1223, 1231 (7th Cir. 1994) (citing cases). This does not mean, however, that the fact of incarceration is irrelevant. "The relevant inquiry is whether a reasonable man in the suspect's position would have understood himself to be in custody." Leviston, 843 F.2d at 304 (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). That inquiry must include consideration of the fact of incarceration. The Supreme Court has indicated that when the individual being questioned is already in prison, "[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing

pressures that . . . will weaken the suspect's will." Illinois v. Perkins, 496 U.S. 292, 297 (1990).[1]

Leviston established that incarceration does not necessarily render an interrogation custodial. But in that case, Leviston asked to speak to the police about a robbery for which he was later convicted. At the time Leviston initiated the interviews, he was incarcerated on an unrelated matter. During Leviston's conversations with the police, and prior to any Miranda warning, Leviston made statements which were later introduced at his trial for the robbery. The District Court found that Leviston initiated the interviews with the police, voluntarily went to the interview room, was free to end the conversations at any time, and was allowed to leave upon request. Leviston was therefore not "in custody" during questioning, and no Miranda warning was required.[2] Leviston, 843 F.2d at 303-04.

We adhere to the rule set forth in Leviston that a Miranda warning is not automatically required when questioning an inmate. Chamberlain's situation, however, differs from Leviston's because Chamberlain did not initiate the conversations with Freer and Ayers. We therefore proceed to examine the other relevant circumstances.

III.

In determining whether Freer's and Ayers's conversations with Chamberlain amounted to custodial interrogation, we are "concerned with the suspect's subjective

---

[1]The Court in Perkins held that undercover questioning of an inmate did not require a Miranda warning because the suspect did not know he was talking with a government agent. Perkins, 496 U.S. at 297. Chamberlain, however, knew he was talking with prison officials.

[2]Leviston was given a Miranda warning, but only after he made a "potentially incriminating . . . statement." Leviston, 843 F.2d at 303.

belief that 'his freedom of action is curtailed to a degree associated with formal arrest' and whether that belief is objectively reasonable under the circumstances." <u>Griffin</u>, 922 F.2d at 1349 (citing <u>Berkemer</u>, 468 U.S. at 439, quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)). A determination of how a reasonable person would have felt in this situation – whether a reasonable person would have thought he was in custody – requires close consideration both of how Chamberlain got to the interview room and of the atmosphere of the interviews once Chamberlain arrived for, and during, questioning.

The six factor analysis set out in <u>United States v. Griffin</u> provides guidance in making this determination:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

> (2) whether the suspect possessed unrestrained freedom of movement during questioning;

> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;

> (5) whether the atmosphere of the questioning was police dominated; or,

> (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349. All six of these factors need not be present for a finding of custody requiring a Miranda warning. Nor is this list exhaustive. See id. The custody issue ultimately "focuses upon the totality of the circumstances." Jenner v. Smith, 982 F.2d 329, 335 (8th Cir. 1993).

The District Court apparently adopted the magistrate judge's recommended finding that "[Chamberlain] was not brought to the interview room under force, or escort." (Report and Recommendation 27.) This finding is not supported by the record. Although it may be unclear exactly how Chamberlain arrived for, or was brought to, the interview, there is no doubt that someone did escort Chamberlain to the interview.

Both Freer and Ayers testified at the pretrial motion hearing that they did not remember how Chamberlain got to the interview room. Freer testified that he brought many of the inmates down to the office for interviews himself or had an officer bring them down. When the officer brought them down, "most of the time" Freer would meet the officer halfway. (Pretrial Mot. Hr'g Tr. 95.) Freer further testified, on cross-examination, that the area in which they conducted the interviews was a "secure area" and anybody entering the area "be it civilian or an inmate, would be escorted." (Pretrial Mot. Hr'g Tr. 111.) Ayers testified that he himself did not go get Chamberlain, but that Chamberlain was "summoned" to the interview. (Pretrial Mot. Hr'g Tr. 142-43.) Chamberlain may have had the freedom to move around within some areas of the prison, but Freer and Ayers conducted the interviews in a secure area, which Chamberlain could not have entered on his own. (Pretrial Mot. Hr'g Tr. 111, 137.) There is no indication that any inmate interviewed by Freer or Ayers during the Insight investigation walked to the interview room of his own accord, without escort from one of the investigators or a prison guard.

Other circumstances also suggest that Chamberlain was the subject of a custodial interrogation. At no time did Freer, Ayers, or any other prison official, tell

Chamberlain that the questioning was voluntary or that he was free to leave the interview at any time. In fact, if Chamberlain had refused to appear for the interview or had left the interview without permission, he would have violated prison rules. During Ayers's cross-examination at the pretrial motion hearing, Ayers testified regarding violation of prison rules:

> Mr. Kushner (for the defense): And when someone who works for the Department of Corrections asks an inmate to do something then they have to do it, right?
>
> Ayers: Yes.
>
> Q: If they don't do something that a corrections staff person or official tells them to do that could be a rule violation, right, it's called disobeying a direct order?
>
> A: Correct.

(Pretrial Mot. Hr'g Tr. 137.) Chamberlain could reasonably have believed that if he did not answer the questions Freer and Ayers asked him during the interviews, he would have been in violation of prison rules. And Chamberlain could reasonably have construed his situation as one in which he was "deprived of his freedom of action in . . . [a] significant way." Miranda, 384 U.S. at 444. Chamberlain was not free to leave, or, at least, not free to leave without risking the consequences.

In addition, the atmosphere of the questioning was police dominated. As we construe the record, prison guards escorted Chamberlain to the interview. The interview was conducted by DOC investigators. Additionally, at the end of questioning, Chamberlain was transferred from the medium-security facility to a close-custody facility, and then to a segregation unit. (Pretrial Mot. Hr'g Tr. 140-42.) Although Chamberlain was not "placed under arrest" (he was already under arrest), his

transfer to a more confined situation was clearly the result of the investigation. Overall, the facts indicate to us that Chamberlain was "in custody" during questioning. The failure to precede the questioning with a Miranda warning therefore violated Chamberlain's Fifth Amendment rights, and his statements during the interview should have been excluded from evidence.

The government argues that even if the admission of Chamberlain's statements about the child lists was error, that error was harmless. We do not agree. Chamberlain was charged with possession of, and conspiracy to distribute, child pornography. Chamberlain admitted, in the statements in question, that the lists, which contained names, addresses, and descriptions of children in the Minnesota area, belonged to him. The government introduced the lists during trial and discussed the lists, in some detail, in its closing argument. (Trial Tr. 370-76, 894-95.) Other evidence against Chamberlain was also introduced at trial – evidence that Chamberlain possessed child pornography (Trial Tr. 277) – but Chamberlain's statements about the lists identified the lists as his. Without Chamberlain's statements, the testimony and closing arguments the jury heard related to the lists would have been far less compelling. The admission of Chamberlain's statements regarding his knowledge of the child lists, therefore, can not be considered harmless error.

## IV.

Chamberlain raises a number of other issues in his appeal. Three of his arguments relate to evidentiary issues: first, that the child lists were inadmissable under Rule 404(b) of the Federal Rules of Evidence because the lists were not relevant to the alleged child pornography offenses; second, that there was insufficient evidence to convict him of conspiracy; and third, that prison disciplinary hearing findings were wrongly excluded. Chamberlain tried to introduce findings from the prison disciplinary hearings which resulted from the Insight investigation. The prison disciplinary committee found Chamberlain not guilty, but the District Court did not allow

Chamberlain to introduce the findings. Chamberlain also argues that he did not have sufficient opportunity to confront and cross-examine William Couture, an inmate who worked with Chamberlain at Insight and a government witness. The Court did not allow Chamberlain to ask Couture about child sex abuse fantasy stories on the hard drive of Couture's computer. Finally, Chamberlain argues that the District Court erred in applying upward adjustments to his offense levels under the federal Sentencing Guidelines.

The District Court did not err on any of these issues, and we therefore reverse only on the <u>Miranda</u> issue. Because Chamberlain was not given a <u>Miranda</u> warning prior to a custodial interrogation, the statements made during that interrogation regarding the child lists should not have been admitted at trial.

Reversed and remanded for a new trial.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-