STATE OF MAINE
PENOBSCOT, ss.

STATE OF MAINE

v.

PATRICK ALEXANDRE

FILED & ENTERED
SUPERIOR COURT

MAY 16 2003

PENOBSCOT COUNTY

SUPERIOR COURT
DOCKET NO. CR-01-847
CMJ -PEN- 5/16/2003

DONALD L. GARBRECHT
LAW LIBRARY

JUN 2 2003

ORDER

Pending before the Court is Patrick Alexandre's (the "Defendant") Motion to Suppress. Donald F. Brown, Esq., for the Defendant and Assistant Attorney General, Fernald LaRochelle for the State. For the following reasons the Court denies the Defendant's motion.

## Background

The Defendant contacted the Maine State Police while incarcerated at the Penobscot County Jail on a West Virginia fugitive from justice charge. He stated in a note that he wished to talk to investigators about a murder. Sgt. Vicki Gardner, Trooper Seth Edwards and Trooper Scott Hamilton responded to the note and Trooper Edwards advised the Defendant of his Miranda rights. The Defendant indicated that he would only talk to specific officers and wanted to speak to his attorney.

On or about November 27, 2000, Maine State Police Special Agent Kenneth MacMaster ("MacMaster") met with the Defendant and his attorney Christopher Smith. The Defendant and his attorney had time to consult before and during the interview. MacMaster did not advise the Defendant of his Miranda rights. There was an initial discussion about what the Defendant wanted in exchange for his information and eventually the Defendant revealed that he was referring to the murder of Joseph Cloak. The Defendant then gave some general information about the location of Clark's body.

1

On November 28, 2000, the Defendant, attorney Smith and an Assistant United States Attorney reviewed a proffer agreement that the Defendant eventually signed. After signing the proffer agreement Detective Steve Pickering, MacMaster and Sgt. Christopher Coleman meet with the Defendant and attorney Smith. It appears that attorney Smith was present for most, but not all of the interview. Detective Pickering advised the Defendant of his Miranda rights before beginning the interview. After reviewing the fact that the police were not making the Defendant any promises, and that he had no immunity for crimes of violence, the Defendant told the police how Cloak disappeared. The Defendant told the officers that he could take them to the burial site and he and attorney Smith agreed that he would go with the officers the next day. The parties understood that attorney Smith would not be present during this trip. On November 29, 2000, the Defendant, MacMaster, and other police officers traveled from the Penobscot County Jail to Bradford, Maine. Attorney Smith was not present during the trip to Bradford and no one advised the Defendant of his Miranda rights. The police eventually recovered the body.

On December 1, 2000, the Defendant went to the U.S. Attorney's office for an interview. Attorney Smith was present during most of the interview. No one advised the Defendant of his Miranda rights but attorney Smith agreed that the Miranda waiver from November 28, 2000, was still in effect. The Defendant discussed his reasons for coming forward and acknowledged that he wished to "beat" the charges in West Virginia. He noted that although he did not get exactly what he wanted he was going to continue to provide information. At some point there was a discussion about a polygraph test and the Defendant stated he would leave the decision up to attorney Smith. Towards the end of

2

the interview attorney Smith announced that he needed to leave. The Defendant stated that he would continue the interview and would refuse to answer questions he did not feel comfortable answering.[1]

On December 2, 2000, the Defendant left the Penobscot County Jail and was taken to the Criminal Investigation Division of the Maine State Police at the Bangor Mental Health Institute to take a polygraph test. The police informed the Defendant and attorney Smith that attorney Smith could not be present in the testing room during the actual examination. Before beginning the examination Detective Keegan went over a two-page document detailing the polygraph procedures.[2] Detective Keegan then read the Defendant his Miranda rights. At some point the Defendant stated, "I can have my attorney present when being questioned?" Detective Keegan replied, "present, means present in the building." At this time the Defendant asked to speak with his attorney and have him look over the waiver form before he signed it. Detective Keegan left the room and upon his return advised the Defendant that attorney Smith signed the waiver and stated that Attorney Smith advised him to sign it. [3] During the examination Detective Pickering watched through an observation room. It is not clear if attorney Smith was aware that he could observe from this location.

---

[1] The Defendant refers to a separate interview on December 1, 2000. However the State has not sought to introduce any statements made during this interview. Even if the police needed to advise the Defendant of his Miranda rights during the interview, failure to advise is not a constitutional violation. The Fifth Amendment does not guarantee Miranda warnings or the presence of counsel; those are court created prophylactic procedures. The Fifth Amendment only protects against self-incrimination. Since the State does not intend to introduce statements made during this interview the Fifth Amendment is not implicated.

[2] The Defendant notes that he cannot read without his glasses and states he did not have them at that time. However there is no evidence that the Defendant ever signed anything that he did not read and further the evidence shows that the Defendant was never in a situation where his eyesight hindered his understanding of any documents.

[3] Due to the Court's decision in this matter it is not necessary to examine whether this was a valid waiver.

After the polygraph examination Detective Keegan briefly left the room and returned to inform the Defendant that had failed the exam. At this time Detective Pickering and Detective Keegan interviewed the Defendant in the presence of attorney Smith. During this interview the Defendant privately consulted with attorney Smith twice. After consultation, and a reminder that he could still face prison time in West Virginia, the Defendant changed his story regarding Cloak's death. After each consultation with Attorney Smith the interviewing officers noticed that the Defendant sanitized his story. The Defendant told the officers that he did not want to make certain statements without first talking to Attorney Smith. He told the officers that he contacted the police regarding Cloak's death because he wanted to go home and he acknowledged that he made a mistake by not being completely honest from the start.

On December 7, 2000, Detective Pickering and Detective Keegan interviewed the Defendant, in the presence of attorney Smith.[4] No one advised the Defendant of his Miranda rights at this interview. Attorney Smith and the Defendant reviewed a proffer agreement from the Maine Attorney General's Office that the Defendant eventually signed. The Defendant reviewed his earlier statements with the officers and stated that he wanted to work with the police and put the matter behind him. He acknowledged that he could not play games and the police informed him that if he could not give verifiable information there was no sense in continuing. The Defendant then gave another version

---

[4] The Defendant mentions an interview that allegedly occurred on December 3, 2000. However, the State has not sought to introduce any statements made during this interview. Even if the police needed to advise the Defendant of his Miranda rights during the interview, failure to advise is not a constitutional violation. The Fifth Amendment does not guarantee Miranda warnings or the presence of counsel; those are court created prophylactic procedures. The Fifth Amendment only protects against self-incrimination. Since the State does not intend to introduce statements made during this interview the Fifth Amendment is not implicated.

4

of the circumstances surrounding Cloak's death. Eventually the Defendant was indicted and arrested for the murder of Joseph Cloak.

The Defendant seeks to have his statements suppressed and alleges that the police failed to properly advise him of his Miranda rights in violation of the Fifth Amendment and violated his Sixth Amendment Right to counsel. The Defendant further alleges that due to a history of drug abuse and mental illness his statements were not voluntary.

## Discussion

### Sixth Amendment

The Sixth Amendment right to counsel does not attach until a defendant has reached a critical stage in a criminal proceeding. State v. Bavouset, 2001 ME 141, ¶4, 784 A.2d 27. In other words, the Sixth Amendment is not triggered until the State brings criminal charges. Jenness v. Nickerson, 637 A.2d 1152, 1156 (Me. 1994). It is clear that at the time the Defendant made his statements the State had not charged the Defendant with any crime relating to Cloak's death and therefore he did not have a Sixth Amendment right to counsel.

### Miranda

#### November 26-December 2

The police must advise a suspect of his Miranda[5] rights before subjecting him to custodial interrogation. State v. Higgins, 2002 ME 77, ¶12, 796 A.2d 50. "Custodial interrogation" is questioning initiated by law enforcement officers of a person in custody or otherwise deprived of his freedom of action in any significant way. Id (internal citations omitted). Therefore, in order for Miranda to apply, a person must be in custody

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

and subject to interrogation. The Court concludes that the Defendant was not in custody for Miranda purposes during the interviews dated November 27, 2000, through the polygraph examination on December 2, 2000, and that even if the Defendant was in custody he was not subject to interrogation. The Court further concludes that even if the Defendant was in custody and subject to interrogation the police did not need to advise the Defendant of his Miranda rights because counsel was actually present.

A defendant is in custody if he is under formal arrest or subject to a "restraint on freedom of movement to the degree associated with formal arrest." Id (quoting Stansbury v. California, 511 U.S 318, 322 (1994)). It is undisputed that the Defendant was in custody in the Penobscot County Jail. The United States Supreme Court, in Mathis v. United States, 391 U.S. 1, 4-5 (1968), stated that "nothing in the Miranda opinion...calls for the curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." The fact that a person is incarcerated for a crime, different from one police are presently investigating, does not remove the need for Miranda warnings.

However Mathis did not stand for the premise that every incarcerated person is in custody for the purposes of Miranda. United States v. Chamberlain, 163 F.3d 499, 502 (8th Cir. 1998).[6] Incarceration does not ipso facto constitute custody. Id; Alston v. Redman, 34 F.3d 1237, 1245 n.6 (3rd Cir. 1994); United States v. Willoughby, 860 F.2d 15 (2nd Cir. 1988). The Supreme Court itself noted, "the bare fact of custody may not in every instance require a warning." Illinois v. Perkins, 496 U.S. 292, 299 (1990). Other

---

[6] The Court notes that the First Circuit (and various other courts), citing Mathis has held that a prison inmate was in custody for Miranda purposes. Palmigiano v. Baxter, 510 F.2d 534 (1st Cir. 1974) (rev'd on other grounds). However, those courts did not address whether Mathis created an ipso facto rule regarding custody. See United States v. Conley, 779 F.2d 970, 972 n.3 (4th Cir. 1985).

Courts have noted that to create a per se rule that all investigatory questioning that occurs inside a prison requires Miranda warnings would disrupt prison administration and would create a situation in which Miranda provides greater protection to prisoners than to nonimprisoned individuals. United States v. Menzer, 29 F.3d 1223, 1231 (7th Cir. 1994)(citing Cervantes v. Walker, 589 F.2d 424, 427 n.7 (9th Cir. 1978).

Incarceration is however relevant and the Court must include the fact of incarceration in its custody determination. Chamberlain, 163 F.3d at 502. The prison setting may increase the likelihood that an inmate is in custody. United States v. Smith, 7 F.3d 1164, 1167 (5th Cir. 1993)(noting that it is generally accepted that an inmate is not always "in custody" for Miranda purposes). The Court examines the totality of the circumstances to determine whether an inmate is "in custody". Menzer, 29 F.3d at 1232, State v. Higgins, 2002 ME 77, ¶13 796 A.2d 50. In non-prison settings a defendant is in custody if he is under formal arrest or subject to a "restraint on freedom of movement to the degree associated with formal arrest." State v. Higgins, 2002 ME at ¶12. Applying the traditional custody test to individuals in prison would result in a per se finding that all incarcerated persons are "in custody" that, as discussed above, does not follow from the Supreme Court's decisions concerning Miranda and prison inmates. Conley 779 F.2d at 973.

To determine whether a prisoner was "in custody" for Miranda purposes Courts have considered whether an inmate was subjected to more than the usual restraint on his liberty, Id (citing Cervantes, 589 F.2d at 428); and whether there was a measure of compulsion beyond confinement, Willoughby, 860 F.2d at 24. The Court in Chamberlain, citing United States v. Griffin, 922 F.2d 1343, 1349, (8th Cir. 1990), used a

six factor analysis to determine whether an inmate was in custody. The Court focused on whether (1) the suspect knew the questioning was voluntary and knew he was either free to leave or free to request the officers to leave; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact or acquiesced to official requests; (4) what types of tactics were used during questioning; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest after questioning. Chamberlain, 163 F.3d at 503. The list is not exhaustive and the issue focuses upon the totality of the circumstances. Id.

The Colorado Supreme Court, citing Cervantes, considers (1) the language used to summon the individual, (2) the physical surroundings of the interrogation; (3) the extent to which he is confronted with evidence of his guilt; and (4) the additional pressure exerted to detain him. People v. Denison, 918 P.2d 1114, 1116 (Co. 1996). The Supreme Judicial Court of Massachusetts accurately sums up the variety of tests and determines whether "the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life." Commonwealth v. Girouard, 766 N.E. 2d 873, 880 (Ma. 2002).

Turning to the present matter, the Court agrees that neither Miranda nor Mathis establishes a per se rule that all questioning of incarcerated persons requires Miranda warnings. The Court will examine the totality of the circumstances to determine if a reasonable person would believe himself to be in custody beyond that normally associated with prison life.

The Court notes that the Defendant voluntarily contacted the police and offered to provide information regarding a murder. The Defendant offers no evidence to suggest

8

that he was ever in custody beyond what one would normally associate with prison life. Although not required the investigators read the Defendant his Miranda rights before the initial interview and the interviews on November 28 and December 2. The Defendant frequently stopped the proceedings to speak with his attorney and receive advice supporting the conclusion that the Defendant understood he was acting voluntarily. In fact the Defendant stated that he would not answer questions that he did not want to, indicating the police were not exerting pressure. The Defendant negotiated two proffer agreements with the assistance of counsel but there is no evidence that the officers made any additional promises or exerted any pressure on the Defendant. The Defendant stated numerous times that the was coming forward to "get this behind him" and move on with his life. Considering the fact that the Defendant was incarcerated, there was not an overbearing police dominated atmosphere. The Defendant spoke with his attorney and even requested specific officers. Although the interviews were lengthy neither the Defendant nor his attorney objected. The Defendant was not arrested until after the grand jury indicted him.

Additionally, the officers involved did not consider the Defendant a suspect until some time after the polygraph test.[7] The Supreme Court has stated, "a police officer's view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." Stansbury v. California, 511 U.S. 318, 329 (1994). However, an officer's knowledge or beliefs may bear upon the custody issue if the officer conveys those beliefs. Id at 300.

_____

[7] There is no evidence that the officers relayed their suspicion to the Defendant after the polygraph examination. Therefore, the fact that the Defendant was a suspect after the polygraph does necessarily indicate the Defendant was "in custody". Considering the Court's decision below, concerning the post-polygraph interviews, it is not necessary to determine whether the Defendant was "in custody" or subject to "interrogation" after the polygraph examination.

The present situation is a clear instance where the officers conveyed their belief that the Defendant was not a suspect. The Defendant approached the officers as a witness, the Defendant was operating under two proffer agreements, the officers never accused the Defendant of the crime, never confronted the Defendant with evidence tending to point to the Defendant's guilt, and never treated the Defendant as anything but a witness.

The Court is free to consider the fact that a defendant was not a suspect when determining whether the defendant was subjected to custodial interrogation. O'Donnell v. State, 374 S.E.2d 729, 732 (Ga. 1989)(a person is not in custody when being questioned if not a suspect); State v. Longley, 483 A.2d 725, 730 (Me. 1984); Commonwealth v. Gil, 471 N.E.2d 30, 37 (Ma. 1984)(evidence showing the defendant was not a suspect at the time of questioning and that the interview was devoid of attempts to compel a statement was indicative of a non-custodial interview); New Jersey v. Seefeldt, 242 A.2d 322, 327 (N.J. 1968); State v. Beaucage, CR-85-128, 1985 Me. Super. LEXIS 368, 12 (December 19, 1985, Me. Super. Ct.); Minnesota v. Johnson, C2-97-1384, 1998 Minn. App. LEXIS 496, *5 (May 5, 1998, Court of Appeals of Minnesota)[8](the officer's questions were an investigation of a witness not a custodial interrogation of a suspect); Zavala v. Texas, 956 S.W.2d 715, 724 (Ct. App. Tx., Thirteenth District, 1997).

Considering the above, the Court is satisfied that the Defendant was not "in custody" for Miranda purposes. Further the fact that the police treated the Defendant as a witness, and that the Defendant understood the police were treating him as a witness,

---

[8] Cited pursuant to Minn. Stat. §480A.08, SUBD. 3.

supports a conclusion that even if the Defendant was "in custody" he was not subject to "interrogation" and therefore Miranda warnings were not necessary. The Supreme Court defined "interrogation" as a "practice that the police should know is reasonably likely to evoke an incriminating response from a *suspect*." Rhode Island v. Innis, 446 U.S. 291, 301 (1980)(emphasis added). Miranda does not work to prevent an individual in custody from talking with the police without the benefit of warnings and counsel, but only prevents the police from interrogating an individual in custody. Wilson v. Schomig, 234, F.Supp. 2d 851, 865 (C.D. IL. 2002)(citing Miranda at 478).

The Court in Wilson held that because the police did not consider the defendant a suspect, the officer's questions were not designed to elicit incriminating statements and therefore did not amount to interrogation. Wilson, 234 F.Supp. at 866. When police are investigating a crime and interviewing witnesses there is no motivation to engage in the type of conduct Miranda prohibits and therefore Miranda warnings are not necessary. Boutwell v. State, 344 S.E.2d 222, 226 (Ga. 1986). Police questioning of individuals in custody does not trigger Miranda unless the purpose of the questioning is to obtain a confession from a suspect. Corbin v. Indiana, 563 N.E.2d 86, 90 (In. 1990).[9] The police do not need to give Miranda warnings to every witness they question during the criminal fact finding process. State v. Iverson, 187 N.W.2d 1, 12 (N.D. 1971)(citing Miranda); Commonwealth v. Horner, 442 A.2d 682, 686 n.10 (Pa. 1982); State v. Garcia, 743 A.2d 1038, 1043 (R.I. 2000).

---

[9] Contra, State of Ohio v. Holt, 725 N.E.2d 1155, 1158-59 (Court of Appeals of Ohio, First Appellate District, 1997)(holding, in a case involving a prisoner in custody due to pretrial detention, that "when an individual is in custody for an unrelated matter, any form of police questioning about another crime is interrogation and requires the recitation of Miranda warnings, regardless of whether the individual is a suspect or a witness.")(citing People v. Lee, 630 P.2 583 (Co. 1981), certiorari denied, 454 U.S. 1162 (1982)).

The police presented testimony that they did not consider the Defendant a suspect until sometime after the polygraph examination. The Defendant voluntarily approached the police and offered information regarding Cloak's murder. At no time before the failed polygraph did the police have any reason to suspect the Defendant and the Defendant's actions confirm that he believed the police were treating him as a witness. Considering the above, even if the Defendant was in custody for Miranda purposes the police did not interrogate him. The police were involved in general investigatory fact finding and treated the Defendant as a witness.

Even if the Defendant was in custody and the police subjected him to interrogation they were not required to advise the Defendant of his Miranda rights because counsel was actually present. Attorney Smith was present on November 27, 2000, November 28, 2000, December 1, 2000, and December 2, 2000 both before and after the polygraph examination. Fidelity to the Miranda doctrine requires courts to strictly enforce it, but only in those situations "in which the concerns that powered the decision are implicated." Illinois v. Perkins, 496 U.S. at 296(quoting Berkemer v. McCarthy, 468 U.S. 420, 437 (1984)). The presence of counsel ensures that police interrogations conform to the dictates of the Fifth Amendment and ensures that a Defendant's statements are not the product of compulsion. Minnick v. Mississippi, 498 U.S. 146, 152 (1990)(citing Miranda 384 U.S. at 466). Therefore when counsel is present the "concerns that powered the decision" are not implicated. Miranda warnings are not necessary when counsel is present. United States v. Guariglia, 757 F.Supp. 259, 264 (S.D.N.Y. 1991); People v. Mounts, 784 P.2d 792, 796 (Co. 1990)(citing United States v. Thevis, 469 F.Supp. 490, 507-508 (D.Conn. 1979), aff'd 614F.2d 1293 (2nd Cir. 1979);

Baxter v. State, 331 S.E.2d 561, 568 (Ga. 1985). The presence of counsel renders Miranda warnings unnecessary and superfluous. Collins v. Delaware, 420 A.2d 170, 176 (De. 1980)(citing United States v. Falcone, 544 F.2d 607 (2nd Cir. 1976).[10]

**Post Polygraph Statements**

Without commenting on whether the Defendant was in custody or subject to interrogation after the police informed him that he had failed the polygraph examination the Court concludes, as discussed above, that the actual presence of attorney Smith rendered Miranda warnings unnecessary.

**Voluntary Statements**

The Defendant further claims that due to mental illness and a history of drug abuse the statements he made to police were not voluntary. The Court examines the totality of the circumstances when considering whether a defendant's statements are voluntary. State v. Sawyer, 2001 ME 88, ¶7, 772 A.2d 1173. The Court considers both internal and external factors such as: the details of the interrogation; the duration of the interrogation; the location of the interrogation; whether the interrogation was custodial; whether there was a recitation of Miranda; the number of officer's involved; the persistence of police officers; police trickery or threats and promises; and the defendant's age, mental health, emotional stability and conduct. Id at ¶9. The Court applies these

---

[10] On November 29, 2000, the Defendant accompanied the police to Bradford to recover Cloak's body. Even if the Defendant was in custody and subject to interrogation, and after considering the test the Law Court articulated in State v. Myers, 345 A.2d 500, 502 (Me. 1975), the Court concludes that the police did not need to re-advise the Defendant of his Miranda rights during the trip to Bradford. See State v. Smith, 675 A.2d 93, 98 (Me. 1996). The ultimate question is whether the Defendant, with full knowledge of his legal rights, knowingly and intentionally relinquished them. State v. Meyers, 345 at 502 (citing Miller v. United States, 396 F.2d 492, 496 (8th Cir. 1968). During the November 28, 2000, interview, at which the Defendant was advised of his Miranda rights and at which Attorney Smith was present, the parties agreed to the Bradford trip.

factors to determine if the totality of the circumstances indicates the defendant's admissions were not the result of "his own free will and rational intellect." Id. The Court notes that the Defendant was not in custody for any crime relating to Cloak's murder, he approached the police to discuss cooperation, he requested certain police officers, even though not required the police advised him of his Miranda rights, and he had the assistance of his attorney throughout the process. In addition the Defendant was operating pursuant to two proffer agreements and the Court finds there were no additional promises, threats, or acts of coercion on the part of the police. As discussed above, the police did not interrogate the Defendant, were not confrontational, and did not coax the defendant into confessing. See State v. Cole, 1997 ME 112, 695 A.2d 1180 (finding that although the police at times approached the interrogation in a confrontational manner and at times coaxed the defendant into confessing, the defendant's confession was still voluntary).

The Defendant claims that his history of mental illness and drug abuse renders his statements involuntary. The Court has examined the transcripts and videotapes of the interviews and taken into account the expert testimony presented during the hearing in this matter. Four experts testified during the hearing, and this court finds and concludes that the opinion of Dr. Shetky, a psychiatrist, was the most compelling. Her opinion and the reasons for her opinion were more in line with the facts and images seen in the videotapes and the transcripts than the testimony of the experts presented by the defense. She opined that the mental health problems of the defendant did not render his statements to the police involuntary. Based on the totality of the circumstances, the Court concludes that the Defendant's history of drug abuse and mental illness did not render his

statements involuntary. Again, the Defendant approached the police seeking to better his situation, requested the assistance of counsel, stopped the interviews at times to privately confer with his attorney, and acted in a rational, coherent manner throughout the process. See State v. Addington, 518 A.2d 449, 452 (Me 1986). The State has proven beyond a reasonable doubt that the Defendant's statements were voluntary.

THE DOCKET ENTRY IS:

The Defendant's Motion to Suppress is hereby denied.

The clerk is ordered to incorporate this decision into the docket by reference.

DATED: 5-15-03

Joseph Jabar
Justice, Superior Court

15

STATE VS PATRICK ALEXANDRE
DOCKET NO CR-01-847

STATE   FERNALD LAROCHELLE, ASST AG
        OFFICE OF THE ATTORNEY GENERAL
        6 STATE HOUSE STATION
        AUGUSTA   ME   04333

DEFENSE   DONALD BROWN ESQ
          36 PENN PLAZA
          BANGOR ME   04401