**STATE of Maine**

v.

**Lavonne M. LAMSON.**

Supreme Judicial Court of Maine.

Argued March 1, 1994.

Decided April 28, 1994.

---

Michael E. Carpenter, Atty. Gen., Joseph E. Wannemacher (orally), Asst. Atty. Gen., Augusta, for State.

Paul A. Weeks (orally), Norton & Weeks, Bangor, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN and DANA, JJ.

CLIFFORD, Justice.

Lavonne M. Lamson appeals from judgments entered in the Superior Court (Hancock County, *Mills, J.*) on jury verdicts convicting her of theft by unauthorized taking or transfer, 17-A M.R.S.A. § 353 (1983) (Class B), theft by deception, 17-A M.R.S.A. § 354 (1983) (Class C), failure to file a state tax return, 36 M.R.S.A. § 5332 (1990) (Class D), forgery, 17-A M.R.S.A. § 703 (1983 & Supp. 1993) (Class D), theft by unauthorized taking or transfer, 17-A M.R.S.A. § 353 (1983) (Class D), and endangering the welfare of an incompetent person, 17-A M.R.S.A. § 855 (1983) (Class D). We agree with Lamson that the evidence adduced at trial was insufficient to sustain the conviction for endangering the welfare of an incompetent person. Further, a review of the record reveals that the jury returned a conviction for a Class E theft by unauthorized taking or transfer, rather than a Class D theft. Accordingly, we vacate the conviction for endangering the welfare of an incompetent person, and modify the judgment to reflect a conviction for a Class E theft. In all other respects, we are unpersuaded by Lamson's contentions and affirm the remaining convictions. We remand, however, for resentencing.

## I.

The jury heard evidence that in 1988, Lamson was employed as a bookkeeper by the Resthaven Nursing Home in Jonesport, and at the same time, was operating a bookkeeping service under the name of Professional Business Services (PBS). Through PBS, Lamson was handling the Resthaven payroll. Pursuant to these arrangements, checks issued by Resthaven bore the signatures of both Lamson and Helen Wass, who was Lamson's supervisor and Resthaven's administrator-in-training.[1] With the permis-

---

1. The title "administrator-in-training," which Lamson also ultimately came to hold at Restha-. ven, apparently has reference to the fact that neither Wass nor Lamson were licensed by the

sion of Wass, however, Lamson sometimes signed both her name and Wass's name to such checks.

In the spring of 1988, Wass denied Lamson's request for permission to take a week of paid leave before it had accrued. According to Wass, she told Lamson that Lamson could take the week off, but without pay. Nevertheless, Lamson issued herself a check in the amount of $397.16 for the week's vacation pay, signed both her name and Wass's name to the check, and negotiated the instrument. According to Lamson, she believed that Wass had not fully "thought through" her decision about the vacation pay, so Lamson issued herself the check hoping to persuade Wass to change her mind on returning home from the vacation. Confronted by Wass on her return to work with what Wass regarded as forgery and theft, Lamson returned the money to Resthaven.

It was also in the spring of 1988 that Lamson was asked to check on Irma Bryant, an elderly local resident who had served as Resthaven's director of nursing. As fellow residents of a small Down East community, Bryant and Lamson had been acquainted with one another and, in fact, Bryant had delivered Lamson's eldest son. According to Lamson, her initial visit to Bryant's home in 1988 revealed that Bryant was in need of some assistance with her daily living. Lamson began to visit Bryant regularly, and eventually Bryant chose to entrust her finances to Lamson. In November of 1989, Bryant made a gift of $50,000 to Resthaven, which the nursing home's board accepted "with the condition that in the event Irma be admitted to the nursing home that this would be considered as room and board." Shortly thereafter, a bed became available at Resthaven and Bryant moved in. All of Bryant's money was deposited in joint accounts bearing the names of Bryant and Lamson.

In the fall of 1988, Wass left her job at Resthaven and Lamson became the facility's acting administrator.[2] Lamson then hired Terry Feeney to do bookkeeping work at Resthaven. Feeney was already working for Lamson as an employee of PBS. An audit subsequently conducted by the Department of Human Services (Department) revealed that $4860 reported by Resthaven as having been paid as salary to Feeney in 1989 was actually paid to PBS. During 1989, the Department was reimbursing Resthaven for ninety-eight percent of its costs through the federal Medicaid program. The auditor concluded that $2445 of the money Resthaven reported as having been paid to Feeney should have been disallowed as a reimbursable Medicaid expense because these funds actually went to Lamson via PBS. According to the Department, this sum was not reimbursable for two reasons: as an administrator, Lamson could not receive payments other than her salary for her work at the nursing home, and the $2445 also placed Resthaven over Medicaid's ceiling for reimbursable administrative expenses. The auditor determined that the remainder of the $4860 was properly disbursed because it ultimately went to Feeney for bookkeeping services she had performed for Resthaven in her capacity as an employee of PBS.

In July of 1990, Lamson authorized the discharge of Resthaven patient Ethel Faulkingham, who moved next door to an unlicensed boarding home, also owned by Resthaven, known as Rosemary's Cottage. According to members of Resthaven's medical staff, Lamson excluded them from the decision to permit Faulkingham to leave Resthaven. Lamson contends that she was simply acting pursuant to Faulkingham's express desire to leave the nursing home setting.

In response to allegations of patient mistreatment at Resthaven, the Department commenced a full investigation in 1990. This

Department of Human Services as a nursing home administrator. It was the practice of Resthaven to hire a licensed administrator to hold the nominal position of administrator and work on a part-time consulting basis, leaving the full-time, day-to-day operation of the facility to the administrator-in-training.

2. Lamson held this title until 1990, when her acting administrator's license expired and the nursing home named her administrator-in-training. Pursuant to the latter arrangement, a licensed administrator worked at the facility for two hours a week as a consultant and Lamson worked at Resthaven on a full-time basis.

in turn led to a criminal investigation by the Attorney General. Lamson blames the stress resulting from this investigation for what she concedes was her failure to file a state income tax return for 1989.

The Resthaven board of directors suspended Lamson in early February 1991, pending the outcome of the investigation. On February 16, 1991, Lamson took Bryant to an attorney in Thomaston where Bryant executed a power of attorney in favor of Lamson. On April 23, 1991, Lamson sent Bryant a letter informing Bryant that Lamson was no longer willing to keep cash belonging to Bryant at Lamson's home. On May 2, 1991, investigators executed a warrant to search Lamson's home. Among other things, the State recovered a box containing $23,290 in cash that Lamson identified as belonging to Bryant. According to Lamson, Bryant had asked her to keep such a large sum of cash because Bryant mistrusted banks.

Also seized from Lamson's home were Bryant's bank records. Having obtained Lamson's bank records, investigators prepared several documents summarizing and analyzing the financial transactions of both Bryant and Lamson during the period that Lamson oversaw Bryant's affairs. The State contended that of $69,574.38 deposited to Lamson's personal account between November 1989 and April 1991, $31,423.21 actually belonged to Bryant. This sum included $18,026.76 in money received from Bryant's account, and $13,066.06 in funds received pursuant to a health insurance policy of which Bryant was the beneficiary. According to the testimony of investigator Fred Stocking, of the money belonging to Bryant that Lamson had caused to be deposited in her own account, only $764.01 had been disbursed either to Bryant directly or to others on Bryant's behalf.

Lamson provided the investigators with her own accounting of the funds in question.

The investigators identified several areas of concern in Lamson's accounting: the fact that Lamson charged Bryant $2256 for "errands and mileage" and $760 for "storage," and the fact that a check listed in Lamson's records as having been paid out of Bryant's account to the local electric utility in the amount of $162.27, actually was in the amount of $5836.59 and had been paid to Lamson's personal account. The investigators noted that, on crediting the $23,290 in cash to Bryant, Lamson had failed to account for either $1883.09 (according to Lamson's figures) or $5981.99 (according to the accounting performed by the investigators) of Bryant's money.[3]

The State filed complaints in the District Court alleging forgery and Class D theft concerning the check written for vacation pay. A grand jury returned an indictment in the Superior Court alleging the remainder of the charges that are the subject of this appeal, as well as three counts of witness tampering, 17–A M.R.S.A. § 454 (Supp.1993) and one count of failing to pay employee income taxes, 36 M.R.S.A. § 184 (1990). The proceedings were consolidated in the Superior Court where, after a hearing, the court (Washington County, *Smith J.*) denied Lamson's motion to suppress evidence obtained from her home pursuant to a search warrant. Venue was transferred to Hancock County to facilitate disposition of the case. Following trial, the jury returned verdicts of guilty on all counts except the counts of witness tampering and the single count alleging failure to pay employee income taxes. From the judgment entered on the convictions, Lamson filed a timely notice of appeal.

## II.

### A. Denial of Motion to Suppress

Lamson first contends that the trial court should have granted her motion to suppress

---

**3.** It was the State's theory that Lamson was not being truthful when she stated that the $23,290 discovered at her home was money she was holding in highly liquid form at Bryant's specific request. Rather, the State contended that as the investigation was reaching its climax and a search of her home seemed likely, Lamson scraped together all the cash she could obtain— in part by canceling a written agreement with her parents to purchase their home and having them return the $12,000 she had already paid to them. Thus, according to the State, the $23,290 in cash turned over by Lamson actually represented part of the money she had intended to steal from Bryant.

the fruits of the search of her home because the affidavit accompanying the warrant was fatally flawed, containing an insufficient basis on which to base a finding of probable cause.

On appeal of a trial court's denial of a suppression motion, we review the determination of the magistrate directly, not making a *de novo* determination of probable cause, but according deference to the decision to issue the warrant. *State v. Perrigo*, 640 A.2d 1074, 1076 (Me.1994); *State v. Veglia*, 620 A.2d 276, 278 (Me.1993). We read the affidavit accompanying the search warrant *"positively* to determine whether it can fairly be read to support the complaint justice's action." *State v. Ward*, 624 A.2d 485, 487 (Me.1993) (emphasis in original). In determining whether probable cause existed, we examine the "totality of the circumstances." *State v. Diamond*, 628 A.2d 1032, 1033 (Me. 1993).

Lamson contends that the affidavit fails to provide any substantial basis from which the magistrate could have concluded that evidence of a crime would be found at her home. In particular, Lamson points to the absence from the affidavit of any direct and absolute allegation from Bryant that she had been the victim of a theft. To accept this contention would be to adopt the kind of "grudging reading" of the affidavit that we have previously rejected as inconsistent with the "totality of the circumstances" test. *See Ward*, 624 A.2d at 487; *State v. Haley*, 571 A.2d 831, 832 (Me.1990). The affidavit recites that an investigation of Resthaven conducted by the Department and the Attorney General revealed that Lamson had assumed control of Bryant's finances, that Bryant was intimidated by Lamson, and that Bryant had indicated through counsel that she considered the property in Lamson's custody to be stolen. The affidavit does not rely on one source but several, none of which are inherently unreliable: the Department investigator; various employees of Resthaven, one of whom told investigators that Lamson had removed Bryant from Resthaven for a day to prevent Bryant from speaking with investigators; Resthaven's nursing director, who stated that Lamson claimed to have removed Bryant because Bryant was being drugged;

Bryant herself, who denied having been drugged; and Bryant's attorney. The affidavit also refers to a review of Bryant's bank records, which suggested that Lamson had transferred thousands of dollars from Bryant's bank account to Lamson's. Reading the affidavit positively, it can fairly be read to support the magistrate's determination of probable cause. The trial court therefore did not err in refusing to suppress the fruits of the search.

### B. Cross-examination of Lamson

Lamson testified on her own behalf at trial. In her direct testimony, she described the execution of the search warrant by stating that her home had been "invaded by seven people from the [Attorney General's] office, state police, at gunpoint." Following this testimony, outside the presence of the jury, the State noted that the reason investigators drew their guns in executing the search warrant was that they were aware that Lamson's son, who was living at her home, had previously been convicted of reckless conduct with a firearm. The State indicated that it would seek to elicit from Lamson on cross-examination that she knew this was the reason authorities had approached her home with guns drawn. Defense counsel objected to such an inquiry as prejudicial and irrelevant, and the State agreed that it would simply ask Lamson whether she knew if investigators had a reason for drawing their guns. The State indicated that it would proceed further with the inquiry only if Lamson denied such knowledge; the court ruled that "we'll take it as it comes," thus holding out the possibility that further objections from Lamson might be sustained.

After Lamson denied that the law enforcement people would have any concern about their safety as they searched her house, the State asked whether her son "was ... involved in an incident with a gun in Rockland ... couple years earlier ... for which he was convicted and spent ten days in jail[.]" Lamson denied that any incident occurred within two years, and when the State pressed on in its questions, she stated that twelve years ago was the more accurate date, that she did not know what the charge was, and ques-

tioned the relevance of the questions. During its closing argument, the State again referred to the investigators' execution of the search warrant with guns drawn. The prosecutor stated, "I'm not going to make a big deal of the reason for that, but there is an explanation other than—other than the fact that they're Gestapo."

On appeal, Lamson contends that the cross-examination and the reference in the closing argument constitute prosecutorial misconduct. She relies on *State v. Flood*, 408 A.2d 1295 (Me.1979) and *State v. Cuddy*, 366 A.2d 858 (Me.1976), two cases in which prosecutors made or introduced assertions as to the existence of a criminal record when they were not prepared to establish the fact of conviction by documentary evidence. *See Cuddy*, 366 A.2d at 859. Lamson does not contend that the State was unprepared to introduce such documentary evidence here, but rather that the documentary evidence shows that the prosecutor "had his facts wrong" because the conviction in question was twelve rather than two years old.

Lamson made no objection at trial to the questions that she now contends prejudiced her. For that reason, we review her allegation of prosecutorial misconduct for obvious error, M.R.Crim.P. 52; M.R.Evid. 103(a)(1), to determine whether " 'the obviousness of the error and the seriousness of the injustice done to the defendant thereby are so great that the Law Court cannot in good conscience let the conviction stand.' " *State v. Tripp*, 634 A.2d 1318, 1320 (Me.1994) (quoting *State v. Dube*, 598 A.2d 742, 744 (Me. 1991)). The questions by the State, although they went beyond the scope of the State's initial representations to the court, and would have been excludable if objected to, do not constitute obvious error. Nor do the State's vague reference to the questions in its closing argument amount to obvious error.

### C. Jury Verdict Forms

 Over Lamson's objection, the court directed the jury to return its verdicts on a verdict form that was designed to assure that the jury considered each pending count separately. Criminal verdict forms are useful when there are multiple charges, but if used,

a form is "best limited to questions of whether the jury finds a defendant guilty or not guilty of a particular charge." *State v. Fournier*, 554 A.2d 1184, 1188 n. 7 (Me.1989). A verdict form does not pass constitutional scrutiny in a criminal proceeding if the form is designed to "lead the jurors down the guilty trail." *State v. Heald*, 307 A.2d 188, 193 (Me.1973). It is evident here that the verdict form does not point the jury in any particular direction and was simply a vehicle for assuring that the jury would consider each pending charge. We cannot agree with Lamson that the use of the verdict form in this case deprived her of a fair trial.

 We note, however, that as to the count alleging theft by unauthorized taking or transfer for Lamson's alleged misappropriation of the disputed vacation pay, the jury returned a verdict that is inconsistent with the judgment entered by the trial court. The verdict form pertaining to this count instructed the jury not simply to indicate a finding of guilty or not guilty, but also to indicate whether the theft amounted to "over $500" or to "$500 or less." This apparently has reference to the fact that $397.16 in net pay allegedly misappropriated by Lamson amounted to more than $500 when the figure was converted to gross pay. Theft is a Class D crime when the value of the property or services stolen exceeds $500 but does not exceed $1000; when the value of property or services does not exceed $500, theft is a Class E crime. 17–A M.R.S.A. § 362(4), (5) (1983). By circling "guilty" and "$500 or less," the jury returned a verdict of Class E theft rather than Class D theft. The judgment must therefore be corrected and Lamson resentenced accordingly.

### D. Sufficiency of the Evidence

 Finally, Lamson contends that the evidence adduced at trial was insufficient to support each of the guilty verdicts returned by the jury. When reviewing challenges to the sufficiency of the evidence, we examine the evidence in the light most favorable to the State to decide whether a factfinder could rationally find every element of the criminal charges beyond a reasonable doubt. *State v. Ho Tai*, 629 A.2d 594, 595 (Me.1993).

We will overturn a jury verdict of guilty only when no trier of fact rationally could have found the essential elements of the charged offenses beyond a reasonable doubt. *Id.*

### 1. Endangering the Welfare of an Incompetent Person

 A person is guilty of endangering the welfare of an incompetent person if [s]he knowingly endangers the health, safety or mental welfare of a person who is unable to care for [her]self because of advanced age, physical or mental disease, disorder or defect.

17-A M.R.S.A. § 555(1). The State must prove two elements: that Faulkingham was unable to care for herself, and that Lamson knowingly acted to place Faulkingham in danger. The State alleged, not that Lamson *failed* to act to protect Faulkingham,[4] but rather that Lamson violated section 555 by removing Faulkingham from Resthaven, an allegation that Lamson acted positively to discharge the patient and that the circumstances of the discharge endangered her welfare. In order for Lamson to be criminally culpable, the State is required to prove that the danger to Faulkingham must have been proximately caused both by her inability to care for herself *and* by Lamson's knowing acts in disregard of Faulkingham's inability. *See State v. Crocker,* 431 A.2d 1323, 1325 (Me.1981); *see also* 17-A M.R.S.A. § 33 (1983).

The evidence was that Faulkingham was frail, her hands trembled, she needed a walker to get around, she needed help getting in and out of bed, and could become confused. There is nothing in the record, however, to suggest that Faulkingham was not aware of her physical infirmities, or that she would be unable to find assistance with her mobility problems at the boarding house. Faulkingham herself sought discharge from the nursing home, and although she was elderly and frail, there is insufficient evidence to suggest that she was not knowingly assuming the risk of physical injury implicit in the assertion of her right to be discharged. We are reluctant to hold nursing home employees criminally responsible for permitting a patient to assert such a right.

The evidence did show, however, that Faulkingham had a serious problem with her medications. At the time of her discharge, she was taking a pain killer for arthritis, a medication to treat high blood pressure, and two types of cardiac medication, one of which she had been prescribed to take four times daily. The evidence would support a finding that Faulkingham was not competent to medicate herself, and that she was impervious to the importance of taking her medications fully and on schedule. Thus, the only sense in which the State proved that Faulkingham was not competent to care for herself related to her medications: her questionable ability to adhere to the prescribed regime, and her apparent lack of awareness of this disability and its life-threatening significance. There is undisputed testimony in the record, however, that Lamson dispatched members of the nursing staff to the boarding home for the purpose of administering and supervising Faulkingham's medication. The evidence demonstrates that Lamson acted to protect Faulkingham with respect to her medications, the only function concerning which Faulkingham was unable to care for herself, and did not act to endanger her in that regard.

The intermittent visits made to Faulkingham by members of Resthaven's nursing staff *ultimately* proved to be insufficient to assure that Faulkingham was properly medicated. Because, however, the indictment alleges only that Lamson endangered the welfare of Faulkingham *at the time of Faulkingham's discharge,* evidence tending to suggest the existence at some *subsequent* time of the element required for endangering the welfare of an incompetent person is not sufficient to demonstrate Lamson's guilt as to the charged offense. *See State v. Rivers,* 634 A.2d 1261, 1264 (Me.1993) (noting that to convict a defendant, the State must prove

---

4. Only a person with a positive duty to protect an incompetent person violates 17-A M.R.S.A. § 555 by failing to act. § 555(2). Section 555(1), however, applies to "all persons in regard to positive acts of endangering, not merely those who are guardians of incompetent persons." § 555 comment (1975).

that the required elements occurred contemporaneously). Because the evidence presented on endangering the welfare of an incompetent person is insufficient, we vacate the conviction on that count.

### 2. Other charges

With respect to the other charges for which the jury returned verdicts of guilty, we cannot say that the jury could not have rationally found every element of the charged crimes beyond a reasonable doubt. *State v. Priest,* 617 A.2d 537, 539 (Me.1992). Lamson has made additional contentions, but we conclude they are without merit and we do not address them. Because we have vacated one of Lamson's convictions, and modified the judgment on another, we remand to allow the Superior Court to resentence Lamson.

The entry is:

Judgment of conviction on the charge of endangering the welfare of an incompetent person vacated and remanded to the Superior Court for entry of a judgment of acquittal. Judgment on the complaint for theft by unauthorized taking or transfer is modified to reflect conviction for Class E rather than Class D theft, and, as modified, affirmed. Remanded to the Superior Court for resentencing. In all other respects, the judgments are affirmed.

All concurring.