2002 ME 77

**STATE of Maine**

v.

**Franklin A. HIGGINS II.**

Supreme Judicial Court of Maine.

Argued: April 3, 2002.
Decided: May 8, 2002.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Lisa Marchese, Asst. Attorney General, Augusta, for State.

Donald F. Brown, Esq, (orally), C. Peter Bos, Esq., Gray & Palmer, Bangor, for defendant.

Panel: SAUFLEY, C.J., CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Franklin A. Higgins II appeals from the judgment of conviction entered in the Superior Court (Penobscot County, *Mead, C.J.*) following a jury verdict finding him guilty of murder pursuant to 17–A M.R.S.A. § 201(1)(A) (1983).[1] Higgins asserts that the Superior Court erred by denying his motion to suppress. Finding no error, we affirm the judgment.

## I.  CASE HISTORY

[¶ 2] On Sunday, February 28, 1999, Katherine Poor was found dead on the kitchen floor of her farmhouse apartment. When Maine State Police Detective Joseph Zamboni arrived at the scene, he surmised that Poor had been sexually assaulted immediately prior to her death. A subsequent autopsy revealed that Poor died as a result of multiple stab and puncture wounds to the neck.

[¶ 3] Detective Zamboni returned to the crime scene on March 1, 1999, to take pictures of the scene and to start collecting evidence. While taking pictures of Poor's apartment, he scanned the bathroom and noticed that the toilet seat was in the up position. Knowing that Poor lived by herself, Detective Zamboni concluded that a man had been present in Poor's apartment. He gathered a number of items including, but not limited to, Poor's diary, two Camel filter cigarette butts, and a list with people's names on it. Higgins's name, along with several others, appeared in Poor's diary and on the list of names. The diary included specific dates in February on which Poor recorded that she had been visited by Higgins at her apartment.

[¶ 4] Higgins voluntarily submitted to interviews with Maine State Police detectives on March 1 and March 2, 1999. During the March 1 interview, Higgins told the police that he had last seen Poor riding her bicycle several days before her death and had last spoken with Poor two and a half weeks before her death. Higgins stated that Poor did not smoke and that he smoked Camel filter cigarettes. At the detectives' request, Higgins agreed to provide a blood sample for DNA testing. He denied killing Poor and claimed that he was working on the night Poor died. On March 2, Higgins contradicted his March 1 statement by telling the State Police detectives that the last time he had seen and spoken with Poor was when he stopped by her apartment on the Thursday before her death.

[¶ 5] On March 9, 1999, Detective Zamboni requested search warrants to search Higgins's residence, vehicle, and person.[2] On the same day, the State Police developed a plan to simultaneously interview Higgins, his wife Judy Higgins, his employer Frank Warren, and Warren's girlfriend. The plan was executed on the morning of March 10. Detectives Preble and Keegan, dressed in civilian clothing, located Higgins where he was working that day, and asked him if they could speak to him regarding two men who were acquaintances of Poor. Higgins consented to speak with them and agreed to leave his place of work and drive his truck to the

---

1. Higgins was sentenced to forty-five years in prison for the crime.

2. Initially, Detective Zamboni requested search warrants for Higgins's residence and vehicle. These warrants were issued by the District Court (Newport, *MacMichael, J.),* and a supplemental search warrant was issued by the District Court (Bangor, *Gunther, J.*) to search Higgins's person, including his clothing and footwear. The District Court issued the supplemental warrant based on the same facts and circumstances as described in the first affidavit.

Kenduskeag fire station. The detectives followed in their car.

[¶ 6] When Higgins and the detectives arrived at the fire station, there were at least three other plainclothes police personnel present. Higgins and the two detectives ascended a flight of stairs to a large, wide-open room where there was a table and some metal chairs. At 9:28 a.m., Detective Preble opened the interview with Higgins by stating: "You're not under arrest, leave at any time, okay? You're not in custody. This isn't what this [is] about ... you mentioned ...." Higgins's first recorded verbal response was "Right." At the beginning of the interview, Higgins told the detectives that he had last seen Poor on the Thursday before her death. He initially denied having seen Poor on the Friday and Saturday before her death; however, approximately one and a half hours into the interview Higgins admitted that he was at Poor's apartment on the night of her murder, but he insisted that she was alive when he left. Approximately three hours into the interview, Higgins contradicted his earlier statements by admitting that he was at Poor's apartment when she died. He stated that he was trying to leave when Poor attacked him with a knife. He claimed that he struck the right side of her face with his open hand, knocking her to the floor, and disarmed her. Higgins claimed that when Poor started to punch him, he struck her with the knife.

[¶ 7] Toward the end of the interview, Detective Keegan asked Higgins if he understood that when he arrived at the fire station he was not under arrest and that he could have left at any time. Higgins responded affirmatively. Throughout the interview the door to the room where Higgins was being questioned was open; Higgins was not placed in any restraints; he

never requested an attorney; he never attempted to leave; and he never informed the detectives that he no longer wished to speak to them. During the interview, Higgins indicated that he knew how the legal system worked and that he was trying to help the detectives.

[¶ 8] At 1:40 p.m., approximately four hours and twelve minutes after Higgins arrived at the fire station, the interview was completed. Higgins was arrested shortly thereafter. While awaiting trial, Higgins was incarcerated at the Penobscot County Jail. During this time, Higgins told four other inmates that he had killed Poor.

[¶ 9] While Higgins was being interviewed, other members of the State Police executed a search warrant at Higgins's residence. Among the articles seized during the search was a pair of work boots belonging to Higgins. On the toe of the left boot was a red-brown stain. The boots were sent to the crime laboratory in Augusta for analysis, and a DNA profile obtained from the stain located on the boot was compared to Poor's DNA profile. In DNA analyst David Muniec's opinion, the DNA profile taken from the stain on Higgins's left boot matched Poor's DNA profile.

[¶ 10] Following his indictment on one count of intentionally and knowingly causing the death of Katherine Poor in violation of 17–A M.R.S.A. § 201(1)(A) (1983) and one count of gross sexual assault in violation of 17–A M.R.S.A. § 253(1)(A) (Supp.2001),[3] Higgins filed a motion to suppress pursuant to M.R.Crim. P. 41A seeking the suppression of physical evidence obtained with the search warrants on the basis that they were obtained without sufficient probable cause. He also sought the suppression of his March 10,

3. The State dismissed the gross sexual assault count on January 8, 2001.

1999, oral statements claiming that they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following an evidentiary hearing, the court denied Higgins's motion to suppress, finding that Higgins was not in custody for *Miranda* purposes at the time that Higgins made the incriminating statements, and that there was sufficient probable cause to issue the search warrants. At Higgins's trial, his incriminating statements and the pair of work boots obtained pursuant to the search warrant were admitted into evidence. Higgins now appeals the Superior Court's denial of his motion to suppress.

## II. DISCUSSION

### A. Custodial Interrogation

[¶ 11] Higgins asserts that the Superior Court erred when it determined that he was not subjected to a custodial interrogation. The State contends that an assessment of the evidence at the suppression hearing in light of the factors listed in *State v. Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226, demonstrates that the Superior Court did not err when it found that Higgins's "statements were made in a non-custodial setting and did not require administration of the *Miranda* warnings."

[¶ 12] We have stated that "[a] person subject to interrogation while in police custody must first be given a *Miranda* warning, otherwise statements made in the course of the interrogation will not be admissible against that person." *State v. Holloway,* 2000 ME 172, ¶ 13, 760 A.2d 223, 228. "The United State Supreme Court has defined 'custodial interrogation' as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Michaud,* 1998 ME 251, ¶ 3, 724

A.2d at 1226 (quoting *Thompson v. Keohane,* 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). "Therefore, a *Miranda* warning is necessary only if a defendant is: (1) 'in custody'; and (2) 'subject to interrogation.'" *Id.* (citing *State v. Swett,* 1998 ME 76, ¶ 4, 709 A.2d 729, 730). "A defendant is 'in custody' if subject to either: (a) a formal arrest; or (b) a 'restraint on freedom of movement [to] the degree associated with a formal arrest.'" *Id.* ¶ 4, 724 A.2d at 1226 (quoting *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

[¶ 13] In making a custody determination, courts must ascertain whether "a reasonable person standing in the shoes of [the defendant] [would] 'have felt [that] he or she was not at liberty to terminate the interrogation and leave.'" *Holloway,* 2000 ME 172, ¶ 14, 760 A.2d at 228 (quoting *Keohane,* 516 U.S. at 112, 116 S.Ct. 457). In *Michaud,* we stated that when a court is analyzing whether a defendant is in custody, it may examine a number of objective factors, including but not limited to the following:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*Michaud,* 1998 ME 251, ¶ 4, 724 A.2d at 1226. "These factors are not to be viewed in isolation, but rather in their totality." *Holloway,* 2000 ME 172, ¶ 19, 760 A.2d at 229. "We will uphold a denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision" and "review any questions of law that arise in the analysis de novo." *State v. O'Rourke,* 2001 ME 163, ¶ 12, 792 A.2d 262, 265 (citing *State v. Thibodeau,* 2000 ME 52, ¶ 5, 747 A.2d 596, 598); *see also State v. Storey,* 1998 ME 161, ¶ 8, 713 A.2d 331, 333 (reviewing historical facts deferentially, "but when the challenge is to the legal conclusion drawn from the historical facts our review is de novo").

■ [¶ 14] Viewing the facts established at the suppression hearing in light of the *Michaud* factors supports the finding that Higgins was not in custody at the time of the March 10th interrogation.[4] On the morning of March 10th, Higgins agreed to speak with Detectives Preble and Keegan in keeping with his earlier expressed desire to assist the police in their investigation. He drove himself to the fire station where he was led to a wide-open room on the second floor. Only two detectives were in the room with Higgins at any one time.

[¶ 15] The detectives informed Higgins that he was not in custody or under arrest and was free to leave. The detectives never restrained Higgins by any means; the door to the room where he was being questioned was left open throughout the interrogation. The form of the interrogation was one of trying to bond with Higgins; the detectives asked questions in a calm, conversational, friendly, and non-confrontational manner; they never raised their voices; they never informed Higgins that he was a suspect; and they offered Higgins something to drink and permitted him to smoke. Higgins never attempted to leave and never indicated that he wished to terminate the discussion. He also never expressed a desire to speak to an attorney. At one point, Higgins indicated that he was trying to help the detectives in their investigation.

[¶ 16] As the interview progressed, the detectives sought to clarify Higgins's prior statements and to reconcile those statements with entries in Poor's diary. After Higgins placed himself at Poor's apartment on the night of her death, the scope of the questions narrowed and Higgins's actions became the focus of the questioning. This fact alone, however, is not enough to convert a non-custodial setting into a custodial one requiring *Miranda* warnings. *See, e.g., Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526. ("Although the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview ... he hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding." (quoting *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976))); *California v. Beheler,* 463 U.S. 1121, 1124 n. 2, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (noting that the Supreme Court previously "rejected the notion that the 'in custody' requirement was satisfied

---

**4.** The State conceded that Higgins was interrogated.

merely because the police interviewed a person who was the 'focus' of a criminal investigation").

[¶ 17] Contrary to Higgins's assertions, the circumstances of this interrogation are substantially different from those presented in *Holloway.* In *Holloway,* we determined that the circumstances gave rise to a custodial setting "if not from the outset of the detectives' questioning, certainly when Holloway asked and was denied an opportunity to end the interrogation so that he could contact a lawyer." 2000 ME 172, ¶ 20, 760 A.2d at 230. Unlike the facts of this case, the police in *Holloway* never informed Holloway that he was free to leave; the interrogation took place in confined quarters; the questions posed by the police were confrontational and accusatorial; Holloway was informed that he was a prime suspect; he was accused of lying and committing the murder; the police prevented him from leaving; the police continued to interrogate Holloway despite his repeated requests that they leave; and the police rejected Holloway's request that the interrogation end so that he could contact an attorney. *Id.* ¶¶ 4–9, 21, 760 A.2d at 225–27, 230.

[¶ 18] In marked contrast to the custodial interrogation in *Holloway,* Higgins's demeanor and conduct throughout his interrogation manifested a desire to cooperate and answer the detectives' questions. Viewed objectively, the detectives' conversational and non-confrontational response would have caused someone in Higgins's position to conclude that, as stated at the outset of the meeting, he remained free to discontinue the interrogation and leave if he so chose. In sum, the totality of the circumstances surrounding the March 10 interrogation supports the finding that Higgins was not "in custody" when he made the incriminating statements.

Therefore, the Superior Court did not err in denying Higgins's motion to suppress.

## B.   Probable Cause for Search Warrant

[¶ 19] Higgins contends that the Superior Court should have granted his motion to suppress the fruits of the search of his vehicle, residence, and person because Detective Zamboni's affidavit was fatally flawed, containing an insufficient basis on which to base a finding of probable cause.

[¶ 20] When we review a denial of a motion to suppress, "we review directly the finding of the magistrate who issued the warrant that probable cause existed." *State v. Crowley,* 1998 ME 187, ¶ 3, 714 A.2d 834, 836. "In determining whether probable cause exists, the magistrate applies the 'totality of the circumstances' test adopted in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." *Crowley,* 1998 ME 187, ¶ 3, 714 A.2d at 836. When applying the totality of the circumstances test the magistrate is required "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* "[C]ourts must give the affidavit a 'positive reading'" and review the affidavit "with all reasonable inferences that may be drawn to support the magistrate's determination." *Id.* ¶ 4, 714 A.2d at 836. Accordingly, courts must accord deference to the magistrate's determination. *Id.; see also State v. Lamson,* 640 A.2d 1076, 1081 (Me. 1994).

[¶ 21] Contrary to Higgins's assertions, the affidavit accompanying the search warrants contained sufficient information upon which to base a finding of probable cause. "Probable cause exists

when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to them, would warrant a prudent person to believe that the items to be seized are evidence of a crime:" *State v. Kennedy*, 645 A.2d 7, 9 (Me.1994). The affidavit stated that (1) Poor received a number of wounds and was sexually assaulted; (2) she lived alone and her doors and windows showed no sign of forced entry; (3) her wounds resulted in blood splattering on the refrigerator and the kitchen wall opposite the refrigerator; (4) the toilet seat was up in the bathroom; (5) two Camel filter cigarette butts were found in an ashtray in the apartment; (6) although Poor did not smoke, she tolerated smoking in her apartment but would clean the ashtrays almost immediately; (7) the cigarette butts were of the same brand and type smoked by Higgins, and the DNA on the cigarette butts matched Higgins's DNA; and (8) although Poor and Higgins had an ongoing relationship, she was scared of him.

[¶ 22] From a positive reading of these facts in their totality, it can be reasonably inferred that Poor was brutally murdered by a male assailant whom she knew; the type of wounds she received resulted in Poor's blood splattering on her assailant; and Poor had an ongoing relationship with Higgins who was at her apartment at or near the time she was murdered. Accordingly, a prudent person would be warranted to believe that the items to be seized from Higgins's residence, vehicle, and person would provide evidence of Poor's murder.

The entry is:

Judgment affirmed.