STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.                                    CRIMINAL ACTION
                                                  DOCKET NO. CR-07-1018

STATE OF MAINE,    **FILED & ENTERED**
                   **SUPERIOR COURT**             **ORDER ON DEFENDANT'S**
    v.                 **MAR 1 6 2009**           **MOTION TO SUPPRESS**
                                                  **ITEMS OF PROPERTY**
JOSPEH DUMAS       **PENOBSCOT COUNTY**

Defendant.


Before the Court is Defendant Joseph Dumas' Motion to Suppress Items of

Property dated March 31, 2008. This motion was consolidated for hearing with Mr.

Dumas' Motion to Suppress Statements of the same date. Hearing on both motions was

conducted on January 6, 2009. Mr. Dumas has been indicted for the murder of Mario

"Sonny" Litterio, which allegedly occurred on or about November 8, 2007. Mr. Dumas

is represented by Attorneys Rick Hartley and Peter Cyr. The State of Maine is

represented by Assistant Attorneys General Andrew Benson and Donald Macomber.

## FACTUAL BACKGROUND

On November 9, 2007, Joseph Dumas was taken to the Penobscot Valley Hospital

in Lincoln, Maine for treatment of injuries sustained in a serious motor vehicle accident.

He had been driving on Route 2 in Lincoln, when he apparently crossed the centerline

and struck a southbound tractor-trailer. When he arrived at the hospital, a doctor sent

orders to X-Ray Technician Jennifer Ward to take x-rays of the Defendant. According to

the sworn testimony of Ms. Ward, she first saw Mr. Dumas at approximately 11 a.m. in a

treatment room, at which time he was lying on a backboard upon a wheeled stretcher.

She told him that she needed to take him across the hall to take x-rays, which she did.

1

She explained that because he was on a backboard and had been in an accident that she was required to do a "cross-table lateral C-spine" x-ray to make sure that his neck and spine were stable. (Tr. at 108). She took a few of these x-rays while he was lying down, and noted that he was upset. She asked him if everything was all right and why he was so upset. He said he wanted to see his wife and Ms. Ward told him that as soon as they were done she would bring his wife in to be with him. At that point he told her that he would not be able to see his wife again, that he was going to jail, and that he had shot someone. She described his demeanor as "whimpery," but stated he was not sobbing. (Tr. at 110).

With the assistance of another medical provider, she transferred Mr. Dumas onto an x-ray table. It was then that she had to remove his coat and upon doing so she noticed a "whole pocketful of bullets." (Tr. at 111). She testified that she had previously removed his pants while he was on the stretcher and that she had found a knife, some Marlboro Light cigarettes, and a container in his pants. She noted that she is required to take off or remove any item of clothing worn by a patient that might have metal on it. (Tr. at 101).

Ms. Ward decided to turn over the items she removed from his pants and coat to law enforcement officers who were waiting outside his room and has admitted that Mr. Dumas' statement that he had shot someone factored into her decision to turn over the items. She testified, "I went out of the door, checked my [x-ray] image and handed those over," referring to the items of property she had removed from Mr. Dumas' clothes. (Tr. at 114). She further testified that no law enforcement officer asked her or demanded that she take the items or turn them over, but that it was her decision. (Tr. at 102).

She also testified that she was certain that the hospital had a policy about what to do with a person's property once it is taken from them, but she did not testify as to what the policy was. (Tr. at 113). She did not have a conversation with Mr. Dumas about taking his clothing other than telling him that she had to remove his pants. She never told him that she was going to give any of his property to the police. (Tr. at 113). She testified that if she had not turned the property over to the police, it would have been stored in a plastic bag and been moved along with the patient to the room in which the patient would be treated. It would then be returned to the patient when the patient's stay was completed. (Tr. at 115).

## FINDINGS AND CONCLUSIONS

The Defendant relies in his argument upon a line of cases in which property was seized from criminal defendants in emergency room or hospital settings. The argument is that a defendant, such as Mr. Dumas, does not forfeit his possessory rights to clothing simply by walking into, or being transported emergently to, a hospital. In *United States v. Neely*, 345 F.3d 366, 368 (5th Cir. 2003), the defendant was admitted and treated for a gunshot wound. Emergency personnel had to remove his clothing in order to treat him, which they did by cutting it away from his body. *Id.* The hospital policy was to inventory the property, place it in a plastic bag, and put the clothing into a storage room. *Id.* It was maintained for five to six days, after which it was thrown away. *Id.* While the defendant was in surgery, an officer requested that medical personnel give him the clothes, which they did. *Id.* The government argued that exigent circumstances justified the seizure, and also that the defendant lost his privacy interest in the clothes by wearing them into a hospital. *Id.* at 368-69. The court rejected those arguments, held that the

3

hospital did not "jointly" possess the clothes, and found the seizure to be unconstitutional. *Id.* at 370-71. The Court, quoting *People v. Yaniak*, 738 N.Y.S.2d 492, 495-96 (Yates County Ct. 2001), held that "once the clothing is taken from the patient and secured by the hospital, the hospital becomes a bailee and the employees have no authority to permit the police to search or test the clothes without the consent of the owner." *Neely*, 345 F.3d at 369-70. The court in *Yaniak* went on to hold that since the hospital had no authority to hand over the clothes, the only way the police could have legally taken them without a warrant – absent application of a recognized exception to the warrant requirement – was if there was evidence that the defendant had abandoned his clothes. *Yaniak*, 738 N.Y.S.2d at 496. Because the hospital's placement of the items in a bag was evidence to the contrary – that the clothes were being stored until they might be returned – the court was unpersuaded by the government's position. *Id.*

The Court has reviewed the cases cited by the defense. In all of the cases in which courts agreed that an unconstitutional seizure had occurred in hospital settings, such as *Neely* and *Yaniak*,[1] the police either asked hospital personnel for the property and received it, or simply took the property with the acquiescence of hospital personnel. In the case at bar, there is no evidence that the police either demanded or even asked for the Defendant's property. The evidence here suggests that the x-ray technician acted on her own, out of a sense of obligation, or because she was trying to be of assistance to law enforcement after hearing that Mr. Dumas had shot someone.

---

[1] This is true also of *United States v. Nanos*, 2006 U.S. Dist. LEXIS 87434 (D. Me. 2006), a case in which the defense asserts that the government conceded the defendant's Motion to Suppress. Although the circumstances behind the government's "concession" are not clear from the opinion, it is perhaps noteworthy that in *Nanos*, the police simply entered the room and removed the clothes from the defendant with some assistance from hospital personnel. *Id.* at *9.

It is axiomatic that a defendant cannot rely upon the exclusionary rule under the Fourth Amendment unless the illegal search or seizure was conducted by state actors. *State v. LeGassey*, 456 A.2d 366, 367 (Me. 1983) (citing *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). The Court, therefore, agrees with the State that where the evidence shows that a private party conducted the search or seizure and that police conduct was not such "as to make her actions their actions for purposes of the Fourth and Fourteenth Amendments and their attendant exclusionary rules," the seizure is not illegal. *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). The Court finds on the basis of the record before it that Ms. Ward did not act as an agent or instrument of the state. Had she been asked, directed, or ordered by the police to turn over the property, the Court might conclude otherwise, but that is not the case at bar.

The entry is:

Defendant's Motion to Suppress Items of Property,
dated March 31, 2008, is **DENIED**.

Date: March 16, 2009

M. Michaela Murphy
Justice, Superior Court

STATE VS. JOSEPH DUMAS
CR-2007-1018

ATTORNEY FOR THE STATE

ANDREW BENSON ASST A G
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION
AUGUSTA   ME   04333


ATTORNEY FOR THE DEFENDANT

RICHARD HARTLEY ESQ
15 COLUMBIA ST SUITE 301
BANGOR   ME   04401

PETER CYR ESQ
85 BRACKETT ST
PORTLAND   ME   04102

STATE OF MAINE
PENOBSCOT, ss.

STATE OF MAINE,

v.

JOSPEH DUMAS,

Defendant.

FILED & ENTERED
SUPERIOR COURT

MAR 1 9 2009

PENOBSCOT COUNTY

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-07-1018

ORDER ON DEFENDANT'S
MOTION TO SUPPRESS
STATEMENTS

Before the Court is Defendant's Motion to Suppress Statements filed March 31, 2008. A testimonial hearing on this motion was held on January 6, 2009. The Defendant is represented by Attorneys Rick Hartley and Peter Cyr and the State is represented by Assistant Attorneys General Andrew Benson and Donald Macomber. Mr. Dumas stands indicted for the murder of Mario "Sonny" Litterio. The murder allegedly occurred on or about November 8, 2007. In his motion, the Defendant challenges the admissibility of the statements given to the Maine State Police during four separate interviews. Two of the interviews were conducted while the Defendant was in the hospital on November 9, 2007 and two were conducted at the Defendant's home in Prentiss, Maine on November 9 and 10 respectively.

## FACTUAL BACKGROUND

On November 9, 2007 Joseph Dumas was transported by ambulance to the Penobscot Valley Hospital in Lincoln, Maine after sustaining injuries when his pickup truck collided with a tractor-trailer. Lincoln Chief of Police Bill Flagg and another Lincoln police officer responded to the accident scene in the morning. Chief Flagg was later called to the hospital by Officer Roebuck of his department, who informed the Chief

1

that Mr. Dumas "was making comments that he'd shot somebody." (Tr. at 77-78). Detective Darryl Peary of the Maine State Police was called to the hospital shortly after noon based on a report to his sergeant that a subject at the hospital had "made some statements regarding possibly shooting a friend or killing a friend." (Tr. at 8).

When Det. Peary arrived at the hospital, he met with Chief Flagg who informed him about the statements and who also turned over to him some items of evidence including keys, .22 shells, a buck knife, and clothing that he had received from an x-ray technician. (Tr. at 9). At the January 6, 2009 hearing, Det. Peary testified that he and Det. Josh Haines of CID 3 attempted to interview Mr. Dumas around 4 p.m. (Tr. at 11). The detectives, who were wearing plain clothes, entered Mr. Dumas' room. Mr. Dumas' daughter was present as well. They identified themselves as State Police detectives. Det. Peary testified as follows.

> Kind of explained the reason we're there. Pretty much as soon as I identified, you know, who we were, that we were with the Maine State Police, he said that he wanted a lawyer. We – we kind of discussed that a little bit, of – of the nature of why he believed he needed a lawyer. He made some spontaneous statements about the automobile accident, indicated that he had been drinking and using drugs. I explained to him that, you know, he was not under arrest. He did not have to talk to me, I was not – not there to talk to him about the automobile accident. My pri— my primary concern was statements that he'd made evidently to some of the hospital staff and just inquiring – um – the legitimacy of those statements.

(Tr. at 10-11).

Detective Peary stated that the conversation lasted five or six minutes, that Mr. Dumas appeared oriented such that he knew that they were detectives, and that his answers seemed appropriate. This interview of Mr. Dumas, the first of four, was recorded by Det. Peary. The second interview, which was conducted within

2

approximately one half hour of the first was also recorded, and was admitted as State's Exhibit 2.

Regarding the second interview, Det. Peary testified that he told Mr. Dumas that he was not there to ask him questions, but that they needed help in finding out where Sonny Litterio was. Mr. Dumas responded by asking Det. Peary if he had checked his address, to which Det. Peary said they had, but that Mr. Litterio was not there. Mr. Dumas responded by saying that "he didn't wish to speak further." (Tr. at 16).

Det. Peary testified that Mr. Dumas did not appear to be intoxicated but that he appeared tired. Det. Peary also testified that CID was not surveilling Mr. Dumas in his hospital room, nor did CID have anyone stationed outside or guarding his room. (Tr. 17-18). After being told a second time by Mr. Dumas that he did not want to talk to them, Det. Peary said he left and did not speak further with Mr. Dumas at the hospital. (Tr. at 17).

Det. Peary attempted to follow Mr. Dumas when he was discharged from the hospital, but he temporarily lost sight of the car in which Mr. Dumas was being driven by his daughter. Det. Peary did see Mr. Dumas and his daughter arrive at Mr. Dumas' residence in Prentiss, and he proceeded to Mr. Litterio's residence where other investigators were. He remained in the area of the Litterio residence from approximately 6:30 to 9:00 p.m. when he received a call from Orono dispatch that Mr. Dumas was on the phone and wanted to speak with him. Det. Peary and Det. Brian Strout then proceeded to Mr. Dumas' home.

Present at the Dumas home were the Defendant, his wife, his two daughters, and their boyfriends. Det. Peary proceeded to read the Defendant his *Miranda* warnings from

a card. A transcript of this third interview was admitted as State's Exhibit 1. During the interview, which lasted for approximately an hour, the Defendant cried at various times when talking about what happened. Det. Peary admitted that he had some trouble getting through the *Miranda* process because "he appeared very, you know, excited, I guess, to talk to us and tell us what happened. And there were times where I needed to slow him down, say, this is very important, we need to get through this, but we're willing to listen to what you have to say, but let's get through this first." (Tr. at. 68).

Mr. Dumas describes in the interview how he had consumed cocaine before the incident such that he was seeing white spots, was "massively high," and was hallucinating under its influence. (State's Ex. 1, at 12). The Defendant also turned over to the State Police other articles of clothes that he was wearing at the time of the shooting, and he drew a map to assist the police in finding Sonny Litterio's body, his wallet, and the firearm used in the shooting. (Tr. at 32). The wallet and firearm were recovered shortly after this interview and the body was recovered the next morning.

After spending the day processing the scene of the killing, Detectives Peary, Strout, and Haines interviewed Mr. Dumas again at his residence. The decision had at that point been made to arrest Mr. Dumas, but the Defendant was not advised of this. He was, however, administered *Miranda* warnings. (Tr. at 34-35). The interview, which lasted approximately an hour and a half, took place at Mr. Dumas' kitchen table as did the interview the evening before. A transcript of this interview was admitted as State's Exhibit 3. Det. Peary stated that he saw no "issues whatsoever" in Mr. Dumas' level of sobriety in either of the interviews conducted at his home. (Tr. at 39).

Det. Peary testified that Mr. Dumas was not threatened in any of the interviews, that he was never handcuffed or restrained, that no effort was made to curtail any of his movements, and that he was never told he was under arrest. He described Mr. Dumas' demeanor in the first interview as "very laid back" and "conversational." (Tr. at 70). In the second interview, Mr. Dumas apparently took umbrage at certain allegations, one being that he had not fired the black powder gun, another being that the Warden Service had found no trace of a deer having been in the vicinity. (State's Ex. 3, at 44, 53). Det. Peary indicated that in the second interview conducted at his residence, Mr. Dumas was "emotional but cooperative." (Tr. at 70).

## FINDINGS AND CONCLUSIONS

The Defendant relies upon *Davis v. United States,* 512 U.S. 452, 458 (1994), in support of its argument that Mr. Dumas' clear invocation of his right to counsel requires suppression of all the statements he made to the police during and after his hospitalization on November 9 and 10. The Court agrees that Mr. Dumas clearly invoked his right to counsel on several occasions during the two interviews conducted at the Penobscot County Hospital. However, suppression of those statements is only required if the questioning of the Defendant occurred while he was in custody. This has long been the law in Maine and throughout the nation, as of the decision of the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966).

In *State v. Grant,* 2008 ME 14, 939 A.2d 93, the Law Court recently restated the criteria for determining whether or not a defendant is in custody at the time of an interrogation. The Court stated that the issue is "whether a reasonable person in the suspect's circumstances would have felt that he or she was subject to 'formal arrest or

5

restraint on freedom of movement [to] the degree associated with formal arrest.'" *Id.* ¶ 25, 939 A.2d at 101 (alteration in original) (quoting *State v. Holloway*, 2000 ME 172, ¶ 14, 760 A.2d, 223, 228). The State bears the burden of proof to establish by a preponderance of the evidence that Mr. Dumas was not in custody. *State v. Hewes*, 558 A.2d 696, 698 (Me. 1989).

In *Grant*, the Court set forth factors that a court must view in their totality to determine whether or not a person is in custody. Those factors include, but are not limited to the following:

> (1) [T]he locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant); (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation.

*Grant*, 2008 ME 14, ¶ 26, 939 A.2d at 101 (quoting *State v. Higgins*, 2002 ME 77, ¶ 13, 796 A.2d 50, 54-55).

This Court will analyze each interrogation separately in the light of the above factors to see if the State has met its burden of proof to establish that Mr. Dumas was not in custody.

### A. In-hospital Interviews on November 9, 2007

Two separate interviews of Mr. Dumas were conducted while he was at the Penobscot County Hospital in Lincoln. He was not given *Miranda* warnings during

either of these interviews. In the first interview, it appears that Mr. Dumas made no incriminating statements about the killing of Mr. Litterio but he did make statements indicating that the motor vehicle accident was his fault, implying that it was caused by his consumption of alcohol and drugs. This interview lasted about five to six minutes. He began the interview by making clear to Det. Peary that he would speak to him but only with a lawyer present.

Applying the above factors to this interview, the Court concludes that the Defendant was not in custody during the first in-hospital interview. The interview took place, by necessity, in the Defendant's hospital room. Two law enforcement officers were present, but Mr. Dumas' daughter was there as well. While the officers initiated the contact, they did so not knowing for certain that Mr. Litterio was in fact dead and the Court agrees with the State that no probable cause existed at that time to charge Mr. Dumas with homicide and perhaps not even a motor vehicle offense. Nothing was communicated to Mr. Dumas about his ability to leave or get away from the officers and Mr. Dumas was able to clearly tell them that he was not, at that time, willing to answer any questions. The interaction was very brief, just a few minutes in duration. He was not restrained in any way by the officers and there was nothing heard in the recording that suggested that either detective was communicating anything that would suggest to a reasonable person that he was being forced or compelled to answer questions. On the contrary, when told he did not want to answer questions, the officers left.

The second interview was even shorter than the first, lasting only a minute or two. In this interview, Detective Peary asked Mr. Dumas if he could tell them anything about Mr. Litterio's whereabouts. The only statement that might qualify as incriminating was

Mr. Dumas' question to the officers whether they had checked Mr. Litterio's address (since he knew he was already dead). Immediately after this exchange, Mr. Dumas reiterated that he did not wish to speak to the officers and they once again left him alone. He was discharged from the hospital shortly thereafter without any interference from law enforcement and went back to his residence along with his daughter. The Court notes that this exchange was very brief. No physical restraints were employed; no show of authority was displayed; nothing was communicated to him that would suggest to a reasonable person that he was not at liberty to leave. The Court concludes that Mr. Dumas was not in custody during the second in-hospital interview.

### B. In-home Interview on November, 9, 2007

The Court has reviewed the recording as well as the transcript of this interview. The Court would note at the outset that this was an interview initiated by the Defendant, which occurred at a place of his choosing – his home. His wife, two daughters, and their boyfriends were present during the interview. While it lasted for about an hour, and while the Defendant was emotional at times, once again there was nothing in the behavior, tone, or demeanor of the law enforcement officers that would have communicated to a reasonable person that he was not free to leave or to cease questioning. There was also nothing in Mr. Dumas' statements or behavior that would have communicated to the police that he felt that his liberty had been constrained. Probable cause was growing against Mr. Dumas at this time and he was obviously the target of the investigation. However, that fact alone is insufficient to convince the Court that he was in custody.

Of equal importance, the Court finds that the Defendant received clear *Miranda* warnings and clearly waived his rights to remain silent and to have the presence or assistance of counsel. While it is clear from the interview that, as Det. Peary testified, there was some difficulty completing the *Miranda* process – the warnings extend over approximately seven pages of the thirty-eight page transcript of the interview – it is clear that the primary reason they took so long to administer was that Mr. Dumas kept interrupting Det. Peary with spontaneous, inculpatory statements.

The Court finds that the State has met its burden to prove not only that the Defendant was not in custody during this interview but also its burden to prove that the Defendant effectively waived his right to remain silent and his right to counsel, despite his previous invocation of his rights during the hospital interviews. *See Davis*, 512 U.S. at 458; *State v. Lavoie*, 562 A.2d 146, 150 (Me. 1989).

### C.   *In-home Interview of November 10, 2007*

This interview was conducted after Mr. Litterio's body had been found thanks to directions given to the police during the November 9, 2007 in-home interview. It was conducted after the decision had been made to arrest Mr. Dumas. While it took place at his residence, it was initiated by law enforcement.

The Court would note that at the conclusion of the first in-home interview, it seems clear that Mr. Dumas was aware that he was very soon going to be arrested for Mr. Litterio's death. He had just given the police information about where his body, wallet, and firearm would be found, including drawing them a map. He turned over items of physical evidence to them. In addition, at the conclusion of that interview, the detectives and Mr. Dumas have an exchange that indicates that the police are very soon going to be

coming back for him after they allow him to have some more time with his family. The exchange includes the following:

> DP: Ok. Umm, and I know Brian mentioned earlier about you know, we can't make promises about what's going to happen, ok, umm, at this time you're not under arrest, ok, I'm obviously you know, phone calls will have to be made, and you know, umm, decisions you know. . .
>
> JD: So I can spend a little bit of time with my family. . .
>
> DP: Yeah. Yeah.
>
> BS: Yeah.
>
> JD: I'm not going nowhere.
>
> DP: And we know that. Ok.
>
> JD: I won't go nowhere, I
>
> DP: We can tell, we can tell right now, we can tell right now you're a straight up guy. Ok.
>
> BS: Umm humm.
>
> DP: And I'm sure you, you'd appreciate some time whatever, it might be in.
>
> JD: Are you going to come back and get me personally?
>
> BS: In, we'll be.
>
> JD: Ok.

(State's Ex. 1, at 34-35). The discussion then turns to Mr. Dumas' past problems with the law when he was a young man, but soon returns to what is sure to happen next:

> BS: Yeah. Absolutely. Could tell. You're the kind of guy that that would bother, Joe. What can we do for you? We're gonna give you some time.
>
> JD: You've been good to me. . .
>
> BS: We're gonna give you some time with your family, and. . .

JD: I can't say anything, I can't ask for anything, you been good to me. Great to me. Without a doubt.

BS: Ok.

DP: Give you some time.

BS: Umm humm.

DP: Ok.

BS: We've gotta make a couple of calls anyway, so.

DP: You want to bring your family in, do you want to talk to us with them here at all or do you just want to spend time or?

JD: Umm, I don't know. I just want to probably just spend time with them.

DP: Ok.

BS: Ok.

JD: And I know you. . .

DP: Ok.

JD: . . .gonna have to come and. . .

BS: Yeah, we'll we'll talk about that in a few minutes.

JD: Umm humm.

BS: Just make a couple calls, so, we'll end the interview at 2215 hours.

(State's Ex. 1, at 37-38).

In light of how this first in-home interview concluded, the Court finds that Mr. Dumas knew, and a reasonable person in his position would know, that he would very soon be arrested for killing Mr. Litterio. It is clear that he was being told that he was being allowed to spend a little more time with his family before that inevitably occurred. Therefore, when the police return to his house for the last interview, the Court finds that

they have communicated to him, and he has communicated to them that he is aware, that he is not at that time free to leave. The Court, therefore, finds that the fourth interview was conducted while Mr. Dumas was in custody.

The Court also finds, however, that while the State has failed to prove he was not in custody during this last interview, they have proved that he effectively waived his right to self-incrimination and his right to counsel at the outset of this final interview. The warnings were clearly administered and the officers carefully obtained discrete answers to all of their questions about his willingness to waive his right to remain silent and his right to counsel. (State's Ex. 4, at 1-4).

The Court would finally note that while the Defendant in his March 31, 2008 motion alleged that Mr. Dumas' statements were involuntary, in his post-hearing Memorandum filed January 21, 2009, this argument was not pursued. The Court, therefore, declines to make any findings on that issue.

The entry is:

> Defendant's Motion to Suppress Statements, dated March 31, 2008, is **DENIED**. All statements made by the Defendant during the four interviews conducted on November 9, 2007 and November 10, 2007 may be used by the State at trial against the Defendant.

Date: March 19, 2009

M. Michaela Murphy
Justice, Superior Court

12

State of Maine v. Joseph Dumas
Penobscot County Superior Court CR-2007-1018


Attorney General:

Andrew Benson, Assistant Attorney General
Office of the Attorney General
6 State House Station Station
Augusta, ME 04333


Defense Co-Counsel:

Richard L. Hartley, Esq.
15 Columbia Street, Suite 301
Bangor, ME 04401

Peter J. Cyr, Esq.
85 Brackett Street
Portland, ME 04102